UNITED STATES of America, ex rel. VUITTON ET FILS S.A., and Louis Vuitton S.A., Plaintiffs,

v.

KAREN BAGS, INC., Jade Handbag Co., Inc., Sol N. Klayminc and Jak Handbag Inc., Defendants and Alleged Criminal Contemnors,

**and**

Barry Dean Klayminc, Gerald J. Young, George Cariste, S.M.E., S.A., Crystal, S.A., David Rochman, Robert G. Pariseault, Esq. and Nathan Helfand, Additional Alleged Criminal Contemnors.

No. 83 Cr. Misc. 1, p. 22–CLB.

United States District Court, S.D. New York.

April 9, 1984.

J. Joseph Bainton, Robert P. Devlin, Specially Appointed Attys. (Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City), for United States.

William P. Weininger, Samuel & Weininger, New York City, for defendant Sol Klayminc.

James A. Cohen, Washington Square Legal Services, Inc., New York City, for defendant Barry Klayminc.

Leonard Comden, Wasserman, Comden & Casselman, Encino, Cal., for defendant Gerald J. Young.

Mitchell B. Craner, Guazzo, Silagi, Craner & Perelson, P.C., New York City, for defendant George Cariste.

Charles J. Rogers, Jr., Providence, R.I., for defendant Robert G. Pariseault.

Thomas R. Matarazzo, Brooklyn, N.Y., for defendant Nathan Helfand.

Allen B. Bickart, Phoenix, Ariz., for defendant David Rochman.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Increasingly in recent years, amid considerable evidence that the production and distribution of counterfeit apparel, accessories and novelty gifts, ranging from "E.T." jewelry to "Grateful Dead" T-Shirts, has reached epic proportions, owners of trademarks and licenses in these items have fought back, bringing numerous suits to restrain the marketing of counterfeit goods. One of the more active litigants in this respect has been Vuitton et Fils S.A., which is well known as a leading manufacturer of haute couture leather goods. In order to protect its trademark and profits from retailers of bogus handbags and related items, Vuitton has brought upwards of 80 suits in this Circuit alone. See *Matter of Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir.1979).

The criminal contempt proceedings challenged in this case arise out of one such effort by Vuitton—a civil action commenced in December, 1978 entitled *Vuitton et Fils S.A. v. Karen Bags, Inc., et al.,* 78 Civ. 5863. In that action, the complainant sought injunctive relief and damages for trademark infringement and unfair competition allegedly committed by several defendants, including Sol Klayminc, Jade Handbag Co., Inc. ("Jade"), and Karen Bags, Inc. ("Karen"). Shortly after the complaint was filed, the defendants consented to the entry of a preliminary injunction and further proceedings were stayed pending resolution in another court of the validity of the disputed trademark.

After determining, in July 1981, the alleged criminal contemnor Sol Klayminc, his wife Sylvia, and the family-owned companies Jade and Karen were continuing to sell counterfeit Vuitton products in violation of the injunction issued in December, 1978, Vuitton made an *ex parte* request for an order directing Klayminc and several others to show cause why they should not be cited for civil and criminal contempt. Vuitton also moved to have its own attorney, Joseph Bainton, appointed to prosecute the alleged criminal contempt on behalf of the United States. Both applications were granted by Order dated July 8, 1981. The Court subsequently directed that the criminal contempt be referred to a United States Magistrate for trial as a petty offense. At the conclusion of a trial held before Magistrate Leonard A. Bernikow, Sol Klayminc and the corporate defendants Jade and Karen were convicted of criminal contempt.

The underlying civil action was disposed of through a settlement agreement dated July 13, 1982 which provided that the aforementioned criminal contemnors, as well as Sylvia Klayminc, the Klayminc's son Barry, and another Klayminc company, Jak Handbag, Inc. would pay Vuitton $100,000.00 plus interest over a specified period. The Klaymincs and the affiliated firms agreed to the issuance of the permanent injunction sought in the complaint. The permanent injunction was entered by Judge Lowe of this Court on July 30, 1982 and provided, in

part, that the defendants refrain from producing, distributing or simulating goods in violation of Vuitton trademarks. Subsequently, the Magistrate, having been apprised of the terms of the civil settlement, sentenced Sol Klayminc to one year of probation for his criminal contempt conviction.

According to an affidavit filed in conjunction with the motion for the order to show cause which is at issue here, during the early part of 1983, Vuitton, along with the owners of certain other well known apparel and luggage trademarks, was contacted by a Florida investigation firm and invited to participate in and pay for a "sting" operation. Essentially, the sting involved employees of the security firm posing as merchants interested in buying and selling counterfeit trademarked wares on a large scale. Two of the operatives who undertook prominent roles in the subsequent operation of the sting were a former FBI agent, Gunnar Askeland, and Melvin Weinberg, who had also participated in the so-called "Abscam" operation of recent memory.

During the course of the investigation, alleged criminal contemnor Nathan Helfand, who had arranged for Weinberg and Askeland to purchase counterfeit trademarked goods, brought to their attention an individual named Sol (allegedly Sol Klayminc) who told Helfand that he had been "burned" by Vuitton "to the tune of $100,000," and that notwithstanding this undoubtedly unpleasant experience, he was still in the business of marketing counterfeit Vuitton wares.

Encouraged by Askeland and Weinberg, Helfand entered into further discussions with "Sol" regarding the marketing of counterfeit Vuitton and Gucci wares. During the course of these discussions, Sol allegedly told Helfand that Vuitton products could be obtained from a man in New Jersey named "George." Based upon other information, Vuitton believed George to be alleged criminal contemnor George Cariste, who previously had evidently been identified to Vuitton as a primary supplier of counterfeit Vuitton merchandise.

In an affidavit sworn to on March 30, 1983, Mr. Bainton advised the Court in detail about the alleged instances of wrongdoing which its civil investigation had uncovered, and requested that he and another attorney, Robert P. Devlin, be specially appointed to represent the Government in connection with the prosecution of the criminally contumacious conduct and "to continue the investigation and, in due course, the prosecution of what appears to be a massive international conspiracy to violate this Court's permanent injunction." Bainton's application was accompanied by several exhibits which appeared to support his allegations against several of the accused. In addition, Bainton, correctly observing that an attorney specially appointed to represent the Government in a criminal contempt proceeding "stands in somewhat different shoes than a United States attorney," outlined some of the steps that he would take in further investigating and prosecuting the alleged contempt if his application was granted:

> "On the assumption that this application would be granted, preliminary arrangements have been made for a meeting among Sol, Barry, Askeland, and Weinberg at the Plaza Hotel in New York City, at noon on Tuesday, April 5, 1983 .... In a technical fashion similar to that employed in the Abscam operation, the meeting among those individuals will be video-taped so that at some later time there can be no question as to what was said to whom and by whom. We expect that Sol will repeat the highly incriminatory statements he made last week at dinner with Helfand and on other occasions over the telephone to Helfand .... Sol has also been requested to bring to the meeting 25 of his better counterfeit Vuitton satchel purses ...."

Recognizing that it is generally deemed unethical for an attorney to participate in the surreptitious recordings of conversations, Bainton noted that he would not be similarly constrained if his application to be appointed special prosecutor were granted.

In an order dated the next day, Judge Lasker of this Court, finding that there was probable cause to believe that the named alleged criminal contemnors were "knowingly engaged in a course of conduct criminally contumacious of this Court's final consent judgment and permanent injunction filed July 30, 1982," granted attorney Bainton's application to be appointed, along with Devlin, "in connection with the further investigation" of the alleged contempt and "the ultimate prosecution therefor." In addition, the Court specifically granted Bainton and Devlin permission to undertake the investigation which they had proposed in their application. Judge Lasker ordered that both Bainton's affidavit and the Court's own order of authorization be kept under seal.

Six days later, on April 6, 1983, Bainton and Devlin, acting pursuant to Judge Lasker's request[1] appeared before me to notify the assigned judge about the granting of Bainton's March 31st application. Bainton also advised the Court that their investigation had revealed that Klayminc and others had continued to deal with counterfeit Vuitton goods. The Court suggested that Mr. Bainton bring the investigation to the official attention of the United States Attorney's Office in this district, and that if requested, he comply with any requests for further information or cooperation which might be made by that office. Mr. Bainton agreed to do so and by letter dated April 6, 1983 made available the evidence which his investigation had uncovered to the Chief of the Criminal Division of the U.S. Attorney's Office for this district.

Once appointed to prosecute the alleged criminal contemnors, Mr. Bainton directed an investigation which produced numerous video and audio recorded conversations among the alleged contemnors and members of the investigatory team. Based, in part, on the products of those recordings, Bainton requested and was granted, on April 29, 1983, an Order to Show Cause (for both civil and criminal contempt) against defendants Sol Klayminc, Barry Dean Klayminc, Gerald Young, David Rochman, Robert Pariseault, Nathan Helfand and George Cariste. The show cause order provided for the seizure of enumerated collections of counterfeit Vuitton goods, which had been identified during the course of the investigation, as well as equipment, promotional literature and records related to the manufacture and distribution of counterfeit Vuitton products.

Numerous pre-trial motions have since been made by the defendants, and on October 31, 1983, Bainton and attorneys representing each of the defendants appeared before the Court for oral argument. Post-argument briefs and letters were entertained by the Court, and the motions were fully submitted as of March 13, 1984. All of these motions will be addressed in this memorandum decision and where common legal issues are raised by two or more defendants, their motions will be considered together.

*Motions to Revoke the Special Prosecutors' Appointment and Dismiss the Order to Show Cause.*

The most significant challenge presented concerns the propriety of Judge Lasker's appointment of Mr. Bainton on March 31, 1983 as special prosecutor, and the nature and extent of his activities once invested with that authority.

The appointment of one of the attorneys in a civil action to prosecute a criminal contempt arising from a violation of the Court's orders in such an action is a long-standing practice the validity of which, in principle, is not subject to question. The most oft-quoted passage pertaining to this practice appears in a 1935 case arising in this Circuit, *McCann v. New York Stock Exchange,* 80 F.2d 211, where Judge Learned Hand held:

> "Criminal prosecutions ... are prosecuted either by the United States or by the court to assert its authority. The

---

**1.** On March 30, 1983, in my absence from the district, Vuitton's Rule 42 application was made before Judge Lasker, who was sitting in Part I of the Court. Judge Lasker requested that Mr. Bainton bring to this Court's attention the fact that he had signed the March 31 order.

first are easily ascertainable; they will be openly prosecuted by the district attorney. In the second the Court may proceed sua sponte without the assistance of any attorney, as in the case of a disorder in the courtroom; there can be little doubt about the kind of proceeding when it is done. *But the judge may prefer to use the attorney of a party, who will indeed ordinarily be his only means of information when the contempt is not in his presence. There is no reason why he should not do so, and every reason why he should ....*" 80 F.2d at 214.

Our Court of Appeals has recently endorsed this time honored procedure in *Musidor B.V. v. Great American Screen,* 658 F.2d 60 (2d Cir.1981), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982), where it rejected a due process challenge to a criminal contempt conviction secured by a special prosecutor appointed under circumstances very similar to those in this case. In *Musidor,* as in the instant proceeding, the Court had entered an injunction against dealing in counterfeit T-shirts displaying the trademarks of three rock music groups, and when it became evident that violations of the injunction had occurred, the district court, acting pursuant to Rule 42(b), F.R. Crim.P., appointed the plaintiff's attorney, who had obtained the original injunction, to prosecute the charges. Rejecting the defendants' challenges, after their conviction, to the validity of this procedure, the Court of Appeals quoted approvingly from the *McCann* decision, and observed that the Advisory Committee on Rules had relied upon *McCann* in establishing Rule 42 of the Federal Rules of Criminal Procedure.[2] *Id.* at 64.

The Court restated the rationale underlying the practice, and rejected the argument that criminal contempts invariably must be prosecuted by the United States Attorney:

"Neither Rule 42 nor the Due Process Clause requires the court to select coun-

sel from the staff of the United States Attorney to prosecute a criminal contempt. The practicalities of the situation—when the criminal contempt occurs outside the presence of the Court but in civil litigation—require that the Court be permitted to appoint counsel for the opposing party to prosecute the contempt. There is no fund out of which to pay other counsel in such an event, nor would it be proper that he be paid by the opposing party. This is not the kind of case for which legal aid societies or public defenders are available. In short, we follow the above quoted statement by Judge Hand in *McCann.*" *Id.* at 65.

*See also Universal City Studios v. Broadway Intern.,* 705 F.2d 94 (2d Cir.1983): "[T]he plain implication of the Rule is that the [contempt] proceedings are to be prosecuted either by the federal prosecutor or by a private attorney specifically designated to do so." *Id.* at 97. This practice has been endorsed and followed in other Circuits as well. *See e.g., Frank v. United States,* 384 F.2d 276 (10th Cir.1967), *aff'd. on other grounds,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); *United States ex rel. Brown v. Lederer,* 140 F.2d 136, 138 (7th Cir.1944), *cert. denied,* 322 U.S. 734, 64 S.Ct. 1047, 88 L.Ed.2d 1568 (1944); *In re C.B.S., Inc.,* 570 F.Supp. 578 (E.D.La.1983).

Defendant Barry Klaymine, acknowledging that under *McCann* and *Musidor,* the appointment of private counsel is an acceptable, even "preferred" practice, urges this Court to distinguish or reject *Musidor* in light of decisions which have accorded defendants in criminal contempt cases procedural and constitutional protections enjoyed by other criminal defendants, discussed below. Even were this Court to disavow *Musidor,* defendants fail to demonstrate how the procedure provided for by Rule 42 is necessarily inconsistent with any of their due process rights.

---

**2.** The *McCann* case is specifically cited in the Notes of the Advisory Committee to Rule 42, in conjunction with the Rule's requirement that the notice given to alleged contemnors describe

criminal contempt as such in order to obviate the confusion experienced by the accused in *McCann* as to whether he was being proceeded against civilly or criminally.

In considering defendants' due process challenge to the Rule 42 proceeding approved in this case, and the special prosecutors' actions once invested with that authority, we must keep in mind the still unique status of criminal contempt. While defendants are correct in asserting that we are a long way from the common law treatment of alleged contemnors, which permitted procedures otherwise prohibited in ordinary prosecutions for crime, criminal contempt continues to be characterized by procedures which distinguish it from ordinary statutory offenses. In this century, the Supreme Court has reduced this distinction to a great extent, having ruled, for example, that the standard of proof for criminal contempt is the same as that in any criminal action [*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911)]; that an alleged contemnor is entitled to assistance of counsel [*Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925)]; and the right to a public trial before an unbiased judge [*In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)]. Most recently, in *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the Supreme Court repudiated the longstanding exemption criminal contempts enjoyed from the constitutional requirements of a jury trial.

While it is certainly true that distinctions between contempt and other crimes have eroded, it is not the case, as defendants suggest, that in *Bloom* the Supreme Court swept away the last justification for according criminal contempt a special status. Before *Bloom* it had been undisputed that contempt had been treated differently under federal law:

> "While contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our government, proceedings to punish such offenses have been regarded as *sui generis* and not 'criminal prosecutions' within the Sixth Amendment or common understanding." *Myers v. United States*, 264 U.S. 95, 44 S.Ct. 272, 68 L.Ed. 577 (1925).

This distinction between statutory offenses and the Court's power to demand compliance with its mandates, *United States v. Petito*, 671 F.2d 68 (2d Cir.1982), *cert. denied*, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982), has been the "doctrinal premise from which analysis of procedural safeguards has proceeded," *United States v. Bukowski*, 435 F.2d 1094, 1101 (7th Cir. 1970), *cert. denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971), and accordingly, contempt proceedings have been evaluated by the due process standard of "fundamental fairness" rather than under the specific constitutional provisions governing state and federal statutory offenses. *Id.* at 1101. *See also United States v. Martinez*, 686 F.2d 334, 343–44 (5th Cir.1982): "criminal contempts have retained their unique status as quasi-criminal sanctions." *Id.* at 343. While *Bloom* left no doubt that contempt defendants are entitled to all fundamental procedural protections, courts since 1968 have rejected the suggestion that *Bloom* "signalled an abandonment of the doctrine that attributes 'special constitutional status' to contempt proceedings." *United States v. Nunn*, 622 F.2d 802, 803 (5th Cir.1980); *Bukowski, supra*, 435 F.2d at 1100. Nor is this Court precluded from continuing to weigh, in addressing defendants' challenges to particular aspects of the instant contempt proceeding, the considerations of efficiency, cost and the public interest in vindicating the Court's authority which courts have cited in support of the special procedures provided for in Rule 42. *Musidor, supra*, 658 F.2d at 65; *Universal City Studios, supra*, 705 F.2d at 96; *Nunn, supra*, 622 F.2d at 804.

The procedure provided for in Rule 42 includes the appointment of an attorney of record to prosecute an alleged contempt. The fact that in general the appointment of the attorneys of record in the prior civil case was perfectly proper does not, of course, free us from the duty to address defendants challenges to the extent of the authority given those attorneys by Judge Lasker's order of appointment, or consider whether Mr. Bainton's activities, once vested with special prosecutor status, have in

some way violated defendants' due process rights.

Defendants contend that Judge Lasker's order of March 31, 1983 granted Vuitton's civil attorneys greater authority as prosecutors than was intended in enacting Rule 42, and suggest that the court has taken it upon itself to bestow upon private attorneys unsupervised and unlimited discretion to engage in all those investigatory and supervisory functions traditionally performed only by the office of the United States Attorney.

Defendants' objections to the March 31st order center on their contention that this Court may authorize private attorneys under Rule 42 and *Musidor* to prosecute criminal contempts only when those contempts have "ripened," that is, at a time when it can be demonstrated that a defendant or defendants have completed a violation of the terms of an injunction or other court order with actual knowledge of the Court's directive. Defendants argue that at the time the Court appointed Mr. Bainton and Mr. Devlin as special prosecutors, the acts of criminal contempt complained of (violation of the terms of the injunction pertaining to the Vuitton trademark infringement) had not yet occurred, and that by permitting the plaintiff's attorneys to undertake the type of investigation outlined in Bainton's affidavit submitted in support of Vuitton's motion for his appointment under Rule 42, the Court exceeded its authority.

There would appear to be some validity to the defendants' contention that the Court may not, under Rule 42, confer unlimited authority on a private attorney to perform the full range of investigatory and prosecutorial duties performed by United States attorneys. *E.g., United States ex rel. Vuitton et Fils S.A. v. McNally*, 519 F.Supp. 185, 186 (E.D.N.Y.1981). It is clear, however, that in this case, contrary to the defendants' argument, Bainton and Devlin were not given authority to go out on a "hunting expedition" for the purpose of "ensnaring" subject parties *"before* any probable act of contempt had been committed." (Memorandum of Law of defendant Sol Klayminc). The Bainton affidavit alleges that several of the defendants in this action, as well as others unknown to the plaintiffs at that time, had, at the time of Vuitton's application, committed and completed acts of criminal contempt. These allegations, supported by circumstantial evidence apparent in the marketplace, were considered sufficient by Judge Lasker to establish probable cause that a course of conduct had already commenced which was contumacious of the Court's orders in the Vuitton litigation.[3] (See "Order Appointing Counsel and Approving Certain Investigatory Measures," March 31, 1983). To this extent, then, the Court did authorize the plaintiff's attorneys to prosecute a "ripened" case of criminal contempt. It is true, however, that the Court's order went beyond merely authorizing Vuitton's attorneys to prosecute "ripened" acts of contempt, and granted them the authority to "further investigate" and "ultimately prosecute" the allegedly contumacious conduct,

---

**3.** Mr. Bainton's affidavit described in considerable detail the criminally contumacious enterprise which was alleged to exist, and identified several individuals who were said to play prominent roles in the distribution of counterfeit Vuitton wares. Much of the information allegedly was provided by defendant Helfand, who, after being introduced to Askeland and Weinberg, enabled them to make purchases of bogus items from middle level distributors and small manufacturers. Helfand also brought Sol Klayminc to the investigators' attention. They were informed that he was operating a factory in Haiti which produced counterfeit Vuitton goods. According to Bainton's affidavit, later discussions centered on possible investment by Askeland and Weinberg in the Haiti factory.

Submitted with Bainton's affidavit was a memorandum purportedly written by Klayminc which described the operation of that enterprise and gave its production forecast. (See Ex. E. to Bainton Affidavit, March 30, 1983). At the meeting at which the Haiti operation was discussed, Helfand delivered several counterfeit Vuitton items which were allegedly produced by Klayminc. Other individuals who are accused of having participated in the distribution of counterfeit Vuitton merchandise, including alleged contemnor George Cariste, were identified through Helfand. The allegations contained in the Bainton affidavit were sufficient, as Judge Lasker found, to support a finding of probable cause that a substantial criminally contumacious enterprise was in operation.

and, more specifically, to engage in the investigative techniques set forth in the Bainton Affidavit. It is the Court's authorization of additional investigation that the defendants object to most strenuously.

Defendants argue that in *Musidor* and indeed in all previous cases in which the Rule 42 procedure has been employed, the Special Prosecutor was not required to conduct an extensive investigation to establish the alleged acts of contempt which he sought to prosecute. Quite to the contrary, however, the evidence on which the convictions in *Musidor* were based was obtained through the services of a licensed private investigator, who at various times conducted surveillance on behalf of the plaintiffs, thereby establishing that the defendants were dealing in counterfeit T-shirts in violation of a prior injunction. 658 F.2d at 63. While it would appear that in *Musidor*, the investigation was conducted prior to the request for an order to prosecute under Rule 42, defendants have not explained why it should matter whether the investigation required to prove the existence of the ongoing criminal contempt is performed entirely prior to that request or is performed partially, as in this case, after that order is obtained, so long as the prosecution proceeds in a proper fashion, and defendants' constitutional rights are fully protected.

Contrary to the defendants' assertions, the Court's order of March 31st did not constitute a "hunting [or fishing] license"

with which Vuitton's attorneys could go out and indiscriminately "troll" for potential contemnors. Rather, having demonstrated probable cause that a course of conduct criminally contumacious of this Court's earlier civil injunction was occurring, Vuitton's attorneys were given the authority to define more fully the boundaries of an already well developed contempt. The history of this and similar litigation shows that any action less encompassing than Bainton's attempts to discover the individuals violating a previous injunction will not suffice. In light of the apparent sophistication and resources of those who engage in mass violations of contempt orders in trademark infringement actions, a piecemeal approach, whereby the special prosecutor would have to find at least one act of fully "ripened" contempt before requesting permission to proceed against a particular individual, would prove unavailing.[4] This is not to say that by allowing the prosecutor, as the March 31st order in this case does, to attempt to identify others unknown to him who are participating in an ongoing criminally contumacious course of conduct the Court authorizes him to do so through unlawful means. (See discussion of the actions of the Special Prosecutor, *infra*).

■■■ Defendants suggest that Bainton's activities in his role as "prosecutor" must be narrowly circumscribed under the terms of the Rule, and restricted, essential-

---

**4.** The agility and resourcefulness of wholesale and retail purveyors of counterfeit trademarked goods is at one with the business acumen of cocaine dealers, as is demonstrated in Vuitton's previous attempts by litigation to quel distribution of cheap bogus merchandise which dilutes its valued mark. The Court of Appeals noted the difficulty attendant upon such cases of trademark infringement and unfair competition in *Matter of Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir.1979). In that case, the Court quoted with approval from an affidavit presented by Vuitton:

"Vuitton's experience, based upon the ... actions it has brought and the hundreds of other investigations it has made ... has led to the conclusion that there exist various closely-knit distribution networks of counterfeit Vuitton products.

Vuitton's experience in several of the earliest cases also taught it that once one member of this community of counterfeiters learned that he had been identified by Vuitton and was about to be enjoined from continuing his illegal enterprise, he would immediately transfer his inventory to another counterfeit seller, whose identity would be unknown to Vuitton." *Id.* at 2.

This *modus operandi*, which the Court of Appeals in *Matter of Vuitton* labeled the "persistent factual patterns in Vuitton cases," *id.* at 3, n. 5, surely justifies Vuitton's approach in this case, which attempted to identify as many members as possible of a distribution network before seeking an order to show cause.

ly, to in-court prosecution of fully "ripened" contempts, or the presentation of a show cause order once a contempt has been committed. In support of this construction of Rule 42, defendants contend that nothing in the language of the Rule entitles specially appointed counsel to exercise the wider powers enjoyed by government prosecutors. Defendants fail to point to any cases in which the Rule has been construed in this limited fashion. Indeed, the meaning of the words "to prosecute" as used in Rule 42 has not been at issue in any of the prior cases dealing with this practice. In construing language used in legislation, it must be kept in mind that in the absence of legislative history to the contrary, or some other compelling reason, a Court must conclude that words were meant to have their normal or commonly accepted meaning:

> "As in all cases involving statutory construction, 'our starting point must be the language employed by Congress,' *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 [99 S.Ct. 2326, 2330, 60 L.Ed.2d 931] (1979), and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.' *Richards v. United States*, 369 U.S. 1, 9 [82 S.Ct. 585, 590, 7 L.Ed.2d 492] (1962). Thus '[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980)." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982).

See also, *United States v. Blasius*, 397 F.2d 203 (2d Cir.1968), *cert. denied*, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557

(1969); *United States v. Rose*, 549 F.Supp. 830 (S.D.N.Y.1982). Accordingly, it is clear that a special prosecutor's authority under Rule 42 extends beyond simply presenting evidence in court.

Limiting the extent of an appointed prosecutor's authority in the manner suggested by the defendants would have the effect of defeating the very interests which the procedure is designed to serve. Defendant Barry Klayminc, citing the Court of Appeals' assessment of the practical reasons underlying the Court's authority under Rule 42 (see pp. 739–740, *supra*), states that the "logical solution to the concerns expressed by the Court in *Musidor* is to refer all criminal contempt cases to the public prosecutor." (Defendant Kalyminc's Reply Brief, p. 10). Realistically, however, for many reasons, aggrieved plaintiffs like Vuitton cannot depend on the United States Attorney's Office to enforce the court's mandates in civil cases of this nature.

The offices of the United States Attorneys throughout the nation are already overburdened by those civil and criminal matters for which they have exclusive responsibility,[5] and while in particular cases it may be necessary for them to prosecute conduct criminally contumacious of a civil order, the special appointment procedure provided for in Rule 42 provides a fair and efficient method of vindicating "the public interest in orderly government [which] demands respect for compliance with court mandates," *United States v. Petito*, 671 F.2d 68, 72 (2d Cir.1981), and protecting the interests of civil plaintiffs like Vuitton.

The very scope of the allegedly contumacious enterprise in the instant case, which, according to affidavits and statements sub-

---

5. For example, on a national basis, the number of criminal cases filed in United States District Court has increased perceptibly in recent years, as the following statistics make clear:

UNITED STATES DISTRICT COURTS
Criminal Cases Filed During
Twelve Month Periods Ending in March

| | |
|---|---|
| 1980 | 28,458 |
| 1981 | 30,347 |
| 1982 | 31,942 |
| 1983 | 34,778 |

Expressed as a percentage, the number of criminal cases filed between March 31, 1982 and

mitted by Vuitton's counsel, extends across the United States and beyond its borders, and involves many individuals and millions of dollars in counterfeit merchandise, illustrates the infeasibility of the defendants' contention that the United States Attorney must bear the sole burden of investigating and prosecuting such large and involved issues. The defendants would restrict the special prosecutor's authority to those contempts only which have ripened fully, and would not permit the prosecutors to oversee any post-appointment investigation, as they did in this case. The impracticality of this approach and the effect it would have on plaintiff's ability to make use of the procedure provided for in Rule 42 have already been discussed.

Defendants also assert that the Court's earlier Order constitutes a violation of separation of powers principles in that the federal courts may not order the United States Attorney either to conduct an investigation of allegedly criminal activity or to prosecute a particular case, *e.g.*, *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375 (2d Cir.1973); *Cox v. United States*, 342 F.2d 167 (5th Cir.), *cert. denied sub nom. Cox v. Hauberg*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). There are obvious differences between a case involving a judicial attempt to supervise investigation and prosecution by the United States Attorney and the instant matter, where the appointment of special prosecutor was pursuant to a request made under Rule 42.

Because we find that Rule 42 confers sufficient authority upon the Court to authorize a special prosecutor to undertake the activities performed in this case, we need not determine whether, as Vuitton contends, the All Writs Act, 28 U.S.C. § 1651, similarly empowers the Court to approve these actions. We would observe, however, that insofar as the All Writs Act has been construed to permit a federal court to "issue such commands ... as may

be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained," *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977), it also provides authority for the Court's order in this case.

Of course, as the Court has noted, the interests served by this procedure cannot take precedence over a defendant's due process rights. The Court will next address defendants' specific objections to the appointment made in this case, and to the special prosecutors' actions once appointed.

■ Defendants focus on the conflict of interest which is said inevitably to inhere in this setting. They observe, correctly, that the role of a public prosecutor is not exclusively, or even primarily, adversarial in nature, but exists to insure that "justice shall be done," *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Sensitive to the prosecutor's obligation to the defendant, the public and the criminal justice system, courts have not been hesitant to consider challenges to convictions obtained by government attorneys burdened with a real conflict of interest. *E.g., Berger, supra; Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *Connally v. Georgia*, 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977).

Defendants allege that Mr. Bainton possesses several personal interests which might cause his actions in prosecuting this matter to be governed by something other than his obligation to see that justice be done. The Klaymincs seek to disqualify him from further involvement in this prosecution on the ground that he has two pecuniary reasons for winning contempt convictions. The first is said to derive from the fact that because Vuitton has bankrolled his prosecutorial efforts, Bainton will be expected to win convictions for his client

March 31, 1983 increased by 8.9%. Administrative Office of the United States Courts, *Federal Judicial Workload Statistics* (1983), p. 13. For the same period, the number of civil filings in

which the federal government was a party rose from 70,585 to 89,512, an increase of 26.8%. *Id.* at 7.

and if he does not, Vuitton will take its future substantial legal business elsewhere. Therefore, it is argued, it is unlikely that he would drop charges which ultimately prove unsupportable, or which the "interests of justice" might require be disposed of by negotiated plea. If the Court were to accept this reasoning as grounds for disqualifying counsel in the instant case, it would have to do so in every other trademark case in which a civil plaintiff seeks to have an injunction enforced against a particular defendant, since counsel in all of these cases are compensated by the civil clients. This consideration cannot have escaped the notice of courts which have approved the appointment of privately retained counsel as special prosecutors in previous cases. In *Musidor*, for example, a similar allegation was made concerning the prosecutor appointed by the court. The defendants suggested that because the injunctions violated in *Musidor* were issued in civil actions in which substantial damages were sought, the prosecutor's financial interest in the outcome of the pending civil litigation was an inducement for him to behave unfairly in the trial of the contempt charges so as to obtain an advantage in the civil case. The court refused, on this basis, to overturn the contempt convictions secured by him. 658 F.2d at 64.

Defendants allege, as a second pecuniary motivation, the fact that Mr. Bainton and his law firm are defendants in a defamation action brought in the New York State courts by Sol Klayminc. This lawsuit, the existence of which was revealed to the Court in Bainton's application for appointment of counsel, was commenced in 1982, after Klayminc's federal conviction for contempt of a Court order prohibiting him from dealing in counterfeit Vuitton wares. It has never been brought to trial. In his complaint in the state court defamation action, Klayminc alleges that Mr. Bainton made derogatory remarks about him dur-

ing the course of the prior federal action. Details of this state case, which although almost two (2) years old, apparently has not progressed substantially beyond the complaint stage, were explored by the Court during the October 31, 1983 hearing (Tr. 6, 7, 48–50).

Mr. Bainton personally is protected from any financial loss by his firm's liability insurance, and in any event the Court declines to find that Mr. Bainton would be so motivated by the outcome of the defamation case that he will attempt to obtain unjust criminal convictions of the Klaymincs in order to improve his position in the state defamation action. Indeed, since the civil case has never been placed on a trial calendar or brought to trial, although pending since 1982, an inference follows that it is a frivolous lawsuit interposed solely to impede Vuitton in protecting its mark.[6]

In making these and other arguments, the defendants overlook the commitment of this Court that throughout these proceedings they will be afforded all procedural protections due them. The Court's approval of Vuitton's application in this case does not give the special prosecutors any letters of marque or reprisal against the defendants. This Court will continue to entertain all substantive objections to the manner in which the prosecution is conducted, and will assure that defendants are accorded all the protections given to other criminal defendants.

Defendant Klayminc argues, for example, that a possible source of prejudice to the defendants is that any exculpatory *Brady* or § 3500 material Mr. Bainton may possess may have come to him within the confines of the Vuitton/Bainton attorney-client privilege. The Court addressed this point during the hearing and has ruled explicitly that Vuitton must release all such material. The Court stressed that the

---

6. By a letter filed after the October 31, 1983 hearing had closed, defendant Sol Klayminc raises an additional argument with respect to the conflict of interest claim. He asserts that having filed a petition in bankruptcy, Vuitton, represented by Mr. Bainton's law firm, has filed a complaint to determine non-dischargeability. This post-hearing contention is not regarded as sufficient to require disqualification.

plaintiff has, by authorizing Bainton's efforts and, presumably paying for them, waived any such privilege it might otherwise enjoy. (Tr. 12–13).

■ Defendants also challenge the propriety of the eavesdropping which was conducted in California following the issuance of Judge Lasker's order Approving Counsel and Approving Certain Investigatory Measures. Defendants note that several provisions of the California Penal Code appear to prohibit the surreptitious recording of confidential communications by any "person," defined as including government officials, whether state, local, or federal.[7] Under the terms of the California Penal Code, however, state and local attorneys and law enforcement officials are authorized to record conversations in exercising their official duties.

On April 6, 1983, one week after obtaining the appointment and order from Judge Lasker, Mr. Bainton informed the Court that he had recorded several telephone conversations in New York City. Shortly thereafter, on April 13th, Mr. Bainton wrote to Head Deputy District Attorney Kildebeck of Los Angeles, to whom he had spoken the day before, informing him of his appointment as special prosecutor. Noting that the Penal Code seemed to prohibit him, as a federal official, from supervising eavesdropping in California, Mr. Bainton agreed to Mr. Kildebeck's request that so much of the investigation that was being conducted in California be done at the direction of the latter's office. (Tr. 234–35). The undercover investigation subsequently completed yielded over 70 tape recordings and several videotapes, all made in California, which were cited in requesting the show cause order on April 29th.

■ Defendant's contention that Mr. Bainton behaved improperly in "supervis-

---

7. The relevant portions of the California Penal Code provide:

"§ 631

(a) *Prohibited acts; punishment; recidivists*
(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection ... with any telegraph or telephone wire, line, cable, or instrument, ... or who willfully and without the consent of all parties to the communications, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit ... is punishable by fine ... or by imprisonment ....

* * * * * *

(c) *Evidence*
(c) Except as proof in an action or prosecution for violation of this section, no evidence obtained in violation of this section shall be admissible in any judicial, administrative, legislative or other proceeding.

§ 632 *Eavesdropping on or recording confidential communications*
(a) *Prohibited acts; punishment; recidivists*
(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records such confidential communications ... shall be punishable by fine ... or by imprisonment. * * *
(b) *Person*
(b) The term 'person' includes an individual, business association, partnership, corpora-

tion, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording such communication.

* * * * * *

(d) *Evidence*
(d) Except as proof of an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative or other proceeding.

* * * * * *

§ 633 *Law enforcement officers; authorized use of electronic, etc., equipment*
Nothing in Section 631 or 632 shall be construed as prohibiting the Attorney General, any district attorney, or any assistant, deputy, or investigator of the Attorney General or any district attorney, or any officer of the California Highway Patrol, or any chief of police, assistant chief of police, or policemen of a city or city and county, or any sheriff, under sheriff, or deputy sheriff regularly employed and paid as such of a county, or any person acting pursuant to the direction of one of the above-named law enforcement officers acting within the scope of his authority, from overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter." West's Ann.Cal.Pen.Code, §§ 631–633.

ing" the California wiretaps is without merit. Even if Mr. Bainton's actions were not supervised in turn by the Los Angeles District Attorney, as they appear to have been, any construction of the California Penal Code which would prevent a duly appointed *federal* prosecutor from making tapes which are valid and admissible under federal law would be, as the Ninth Circuit has held in *United States v. Kerrigan*, 514 F.2d 35, 37, n. 5 (9th Cir.1975), "wholly unsupportable." This is because constitutional activities of the federal government are immune from state regulation in the absence of clear Congressional authorization of a particular state regulation. *Hancock v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976); *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

■ While immunity from such state regulation extends to individual federal government agents in the performance of their duties, *United States v. City of Pittsburg, Cal.*, 661 F.2d 783, 785 (9th Cir.1981), defendants contend that Mr. Bainton does not enjoy such immunity because, since he is compensated by a private party, he cannot be elevated to the status of a federal employee. The Court rejects this argument. Once appointed a special prosecutor for purposes of this action, Mr. Bainton is protected by the same official immunity that federal officials enjoy in carrying out their duties, regardless of the source of his compensation.

■ Defendant Barry Klayminc asserts that an additional reason to dismiss the show cause order stems from the special prosecutor's failure to initiate the proceedings by indictment. This argument need not detain us. As the Court has discussed above, criminal contempt proceedings occupy a unique position. One aspect of contempt which separates it from other criminal offenses is the provision, in Rule 42, for the initiation of proceedings by notice, rather than by indictment or information. Defendants contend that the Supreme Court's decision in *Bloom*, holding that jury trials must be provided in serious contempt

cases, overruled, *sub silentio*, its previous decision in *Green v. United States*, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958). This argument has been made many times before, but until now the federal courts have refused to require that criminal contempts proceed by way of indictment. *E.g., Martinez, supra*, 686 F.2d at 343; *Nunn, supra*, 622 F.2d at 804; *United States v. Marthaler*, 571 F.2d 1104 (9th Cir.1978); *Eichhorst*, 544 F.2d 1383, 1386, (7th Cir.1976). Defendants' attempt to distinguish these cases because the contempt proceedings in this case were initiated by a specially appointed prosecutor, rather than by a U.S. Attorney, does not persuade the Court that a departure from this authority is warranted.

In conclusion, the Court declines as a matter of discretion to grant the defendants' request to dismiss the order to show cause and revoke the special prosecutors' appointment.

*Specificity*

■ Defendants Rochman, Young, Cariste and Helfand move to dismiss the order to show cause based on what they claim to be its failure to apprise them adequately of the charge against them, and to allege, with specificity, that they had actual knowledge of the injunction they violated. Defendants argue, correctly, that as non-parties to the injunction issued on July 30, 1982, they may not be found guilty of criminal contempt thereof absent proof that at the time they allegedly acted in violation of the injunction, they had actual knowledge of its existence. *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129 (2d Cir.1979); *United States v. Baker*, 641 F.2d 1311, 1315 (9th Cir.1981). Reasoning that since this knowledge is an essential element of the crime with which they are charged, they argue that the show cause order should be dismissed, because it contains no evidentiary showing that they possessed the requisite mental state.

■ Rule 42(b) "requires criminal contempt to be prosecuted on notice stating the essential facts constituting the con-

tempt charged," *United States v. United Mineworkers of America*, 330 U.S. 258, 296, 67 S.Ct. 677, 697, 91 L.Ed. 884 (1947). As this Court has held herein, Rule 42(b) does not require that contempt proceedings be initiated by a grand jury indictment, and accordingly, the particularity and technical accuracy of an indictment is not required in a prosecution on notice case of this type:

> "Instead, all that is required is that the [defendants] have been 'fairly and completely apprised of the events and conduct constituting the contempt charged.' This is to be judged with reference to all of the court papers served on appellants in light of what transpired in the Court proceedings." *United States v. Eichhorst*, 544 F.2d 1383, 1386 (7th Cir.1976); *see also United States v. Martinez, supra*, 686 F.2d at 345.

Judged by this standard, the notice provided to these defendants in the show cause order provided sufficient information to inform them of the nature and particulars of the contempt charge. The show cause order alleges with respect to each defendant that he is charged with criminal contempt, enumerates the specific role he is alleged to have performed in the production and distribution of counterfeit Vuitton items, and alleges that he had actual knowledge of the terms of the injunction. For example, with regard to defendant Helfand, the show cause order states at p. 6 that:

> "(a) In or about March, 1983, helfand purchased 'samples' of counterfeit Louis Vuitton merchandise from Klayminc, Sr., to show Weinberg:
>
> (b) On or about April 1, 1983, Helfand introduced Weinberg to Klayminc, Sr., for the purpose of facilitating Klayminc, Sr.'s sale to Weinberg of substantial quantities of counterfeit Louis Vuitton merchandise;
>
> (c) During March and April 1983, Helfand aided and abetted Klayminc, Sr., in convincing Weinberg to agree to invest in Klayminc, Sr. and Klayminc, Jr.'s Haitian Louis Vuitton Counterfeiting operation. Helfand engaged in each of the

foregoing acts with others with actual knowledge of the injunction and in wanton disregard thereof."

The Court finds that the allegations against each of the defendants "satisfies due process by 'containing enough to inform [them] of the contempt charged.'" *Martinez, supra*, 686 F.2d at 345, *quoting United States v. Robinson*, 449 F.2d 925 (9th Cir.1971).

Concerning the defendants' complaint that the show cause order does not make a sufficient factual showing that they had actual knowledge of the 1982 injunction, the Court notes that in light of the limited nature of the notice required under Rule 42, Vuitton was not required to allege evidentiary facts supporting every element of the crime charged. *Cf., United States v. Eichhorst, supra*, 544 F.2d at 1385, 1386.

At trial, the Government will be required to prove beyond reasonable doubt as to each defendant, actual knowledge of the prior injunction. It is not required, however, to alleged knowledge with greater specificity at this stage of the proceedings.

Even if the defendants' argument that the Government must demonstrate probable cause that the defendants had such knowledge were accepted, the Court believes that the order to show cause, when read in conjunction with the Bainton Affidavits of March 30th and April 29th, and documents submitted therewith, does present substantial evidence that the defendants were aware of the Consent Order and Injunction issued in July 1982.

■ It is also suggested that the Government should be required to allege facts sufficient to establish probable cause to believe that the acts of contempt alleged actually occurred. While a Court may in its discretion require such a showing in a contempt proceeding, *In re United Corporation*, 166 F.Supp. 343 (D.Del.1958), this is not mandatory and the pleadings in support of the issuance of the show cause order may rest solely upon information and belief. *United States v. United Mineworkers, supra*, 330 U.S. at 296, 67 S.Ct. at

697; Wright & Miller, *Federal Practice and Procedure* (Criminal) § 710.

*Motions for a Separate Trial*

Defendants Rochman, Young and Pariseault move, pursuant to Rule 14 of the Rules of Criminal Procedure, for a trial severance. In addition, Rochman moves under Rule 21(b) for a change of venue.

 Rule 21(b) provides that: "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him ... to another district." A motion for a change of venue is addressed to the sound discretion of the trial judge, *United States v. Garber*, 413 F.2d 284 (2d Cir.1969), and in determining the propriety of a transfer request, he is to be guided, in general, by the criteria set forth in *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). The factors to be considered in addressing Rochman's motion are: location of the defendant, counsel, potential witnesses, and documents and records likely to be in issue; disruption of the defendant's business; expense to the parties; relative accessibility of the place of trial; and the docket condition of each district involved. *Id.* In support of his motion to transfer his case to Arizona, Rochman alleges that he resides in Arizona, that his witnesses all reside in or near Phoenix, Arizona, or Los Angeles, California, that the events in his case occurred in the far West, that New York is not easily accessible for him, his witnesses, and his attorney, who also resides in Arizona. In conjunction with his argument that his witnesses will be severely inconvenienced by a trial in this District, Rochman focuses in particular on the large expense he will incur if forced to transport them to New York.

 While it is undoubtedly true that he would find it more convenient to be tried in Arizona and several factors favor such a transfer, the Court finds that defendant has failed to meet his burden of establishing either that a substantial balance of inconveniences is in his favor, or that the interests of justice require a transfer. *United States v. Wheaton*, 463 F.Supp. 1073, 1079 (S.D.N.Y.1979); *United States v. Williams*, 437 F.Supp. 1047, 1051 (W.D.N.Y.1977). Rochman has failed to support, with requisite specificity, his claim that his witnesses will be inconvenienced by trial in this district. Simple assertions that witnesses will be burdened by trial in a distant forum will not suffice:

> "[T]ransfer motions must identify inconvenienced witnesses whom defendants propose to call and contain a 'showing' of the proposed witnesses' testimony. Defendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial. In short, in order to make an informed decision regarding the necessity of those defense witnesses who would be inconvenienced or unable to attend trial absent transfer, the court must rely on 'concrete demonstrations' of the proposed testimony." *United States v. Haley*, 504 F.Supp. 1124, 1126 (E.D.Pa.1981) and cases therein cited (footnotes omitted); *United States v. Aronoff*, 463 F.Supp. 454, 460 (S.D.N.Y.1978).

While in an affidavit accompanying his motion to transfer, Rochman does name each of the seventeen witnesses he proposes to summon in his behalf, Rochman fails to allege what the substance of their testimony will be, nor does he cite specific examples of their testimony, beyond the most vague identification of each witness as an "activities," "records," or "character" witness. We are not informed what "activities" or "records" these witnesses would testify about, or how this testimony would relate to the offense with which he is charged, or why the records, or for that matter, the activities, could not be the subject of a stipulation. Accordingly, movant has failed to present an adequate basis to support his contentions concerning the defense witnesses.

While defendant is able to demonstrate that trial in this district would interrupt his employment, the Court is not persuaded that he would, as he claims, lose his job.

Although he maintains that he has "neither relatives nor business associates who could assist him in maintaining his job responsibilities with Host National," evidently this may not be the case since his employer is his partner and brother-in-law.

The docket condition of this district as opposed to that of the District of Arizona does not, as Rochman maintains, argue in favor of a transfer here. This Court is current with its criminal calendar, and in any event, the applicable Speedy Trial Act requirements have preempted this *Platt* factor.

Other factors militate against directing a transfer in this case. As the special prosecutor has noted, it is not alleged, as Rochman suggests, that all of his conduct which is alleged to be contumacious occurred in Arizona or California. Evidently the Government's proof will attempt to show that Rochman also met the undercover agents in New York, and then accompanied them elsewhere to factories at which counterfeit Vuitton goods allegedly were produced.

█ If Rochman's case is transferred, the cases of the non-moving defendants will still be tried in New York. In assessing the balance of inconveniences, this Court is entitled to weigh the duplication of effort and court time, as well as additional expense that would be incurred by such a partial transfer. *United States v. Wheaton, supra,* 463 F.Supp. at 1079. The Court does not find that defendant's allegations with respect to the other *Platt* criteria, when considered collectively and weighed against the inconvenience of a transfer, are sufficient to justify a change of venue under Rule 21(b) and, accordingly, the defendant's motion is denied.

In addition to his transfer request, Rochman moves for a severance pursuant to Rule 14, which provides:

"If it appears that a defendant or the Government is prejudiced by a joinder ... of defendants ... for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires."

Defendants Young and Pariseault also request separate trials.

█ A defendant seeking a severance bears a "heavy burden" of demonstrating that he will suffer "substantial prejudice," from a joint trial, *United States v. Carson,* 702 F.2d 351, 366 (2d Cir.), *cert. denied sub nom. Mont v. United States,* —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983):

"Substantial prejudice does not mean merely a better chance of acquittal. The prejudice must be of such a degree that the defendant's rights cannot be 'adequately protected by appropriate admonitory instruction to the jury,' and 'such that, without a severance,' he would 'not receive a fair trial.' Absent such a showing the defendant's request for a separate trial must give way to the public interest in avoiding unnecessary duplicative efforts, trial time and expense." (Citations omitted). *United States v. Potamitis,* 564 F.Supp. 1484, 1486 (S.D.N.Y.1983).

█ Defendant Rochman bases his request for severance on the fact that he is joined with defendants who previously have been involved in Vuitton contempt litigation. Noting that he was not a party to the injunction whose terms he has allegedly violated, has never been involved with any prior trademark litigation, and has only been involved in the "industry" recently, Rochman argues that there is a significant risk that evidence pertaining to the more culpable defendants will "rub off" on him. This argument, commonly referred to as the "spillover" effect, has been made on numerous occasions, most recently in *Carson, supra,* where a defendant asserted that the disproportionate nature of the charges against him, vis-a-vis his co-defendants, and proof that the heroin conspiracy was a "family business" in which his co-defendants had been long involved, caused substantial prejudice to him. Like Rochman, the defendant in *Carson* alleged that the substantial evidence amassed against one defendant will necessarily spill over into the jury's considera-

tion of his less culpable co-defendant. Conceding that there was "no question" that the defendant had played a lesser role in the conspiracy, the Court of Appeals rejected the appeal from denial of severance: "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *Id.* at 366–67; see also *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *Potamitis, supra,* 564 F.Supp. at 1486.

Rochman's contention constitutes "no more than the usual claim that [he] might fare better if severed," which is insufficient, without more, to justify severance. *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). We are persuaded that the Government's case against Rochman, which is described as consisting mostly of recordings, will be "straightforward enough for the jury to consider without any significant spillover effect," *United States v. Losada,* 674 F.2d 167, 171 (2d Cir.1982), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Moreover, limiting instructions as to the use of evidence against each defendant will be sufficient to overcome any prejudice.

Rochman suggests that because several of his co-defendants have been defendants in prior criminal and civil contempt proceedings, evidence of their prior involvement in counterfeiting activities presumably will be presented at trial, and will have a prejudicial effect on his case. In making this argument, defendant overlooks the fact that at trial the Court will instruct the jury to accord each defendant separate consideration, and to refrain from weighing evidence admissible against one defendant against another. *Carson, supra,* 702 F.2d at 367; *United States v. Rosenwasser,* 550 F.2d 806 (2d Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977).

Rochman also contends that as in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a severance is required here because the prosecution intends to use the inculpatory statements of co-defendants against him, depriving him of his right to confront the witnesses against him. This point need not detain us. Assuming that Rochman's prediction about the Government's strategy comes to pass, this argument is premature since *Bruton* would apply only if one or more of his co-defendants elected not to take the stand at trial, and we cannot know, at this stage, whether this will occur. *United States v. Holman,* 490 F.Supp. 755, 764–65 (S.D.N.Y. 1980); *United States v. Olin Corp.,* 465 F.Supp. 1120, 1130 (W.D.N.Y.1979). Furthermore, *Bruton* does not apply to a co-defendant's extra-judicial admission which may be received in evidence under Rule 801(d)(2)(D) or (E), F.R.Evid. Accordingly, Rochman's motion for severance is denied.

Defendant Young also asserts that the extensive nature of the evidence which the prosecution will offer against his co-defendants will have a spillover effect on his case, and that the jury will be unable to separate evidence bearing on his guilt from that pertaining to his co-defendants. Essentially, these are the same arguments made in favor of severance by defendant Rochman. The Court finds that Young's "spillover" argument is no more persuasive than that made by Rochman, and believes that a properly instructed jury will be able to deal fairly with each defendant. Unlike the defendant in *United States v. Mardian,* 546 F.2d 973 (D.C.Cir.1976), which he cites, Young is a participant in several of the recordings and tapes which the prosecution will attempt to introduce. As with Rochman, the Court finds no merit in Young's *Bruton* argument.

 In support of his motion to sever, defendant Pariseault merely alleges, in a conclusory fashion, joinder will be prejudicial to him because of the extensive nature of the testimony against his co-defendants and the possibility that they may have inconsistent defenses. The fact that evidence against Pariseault's co-defendants may be stronger than what is offered

against him, or the presence of hostility among Pariseault and his co-defendants are insufficient, without more, to justify severance. *Potamitis, supra,* 564 F.Supp. at 1486–87.

In addition to his motion to sever, Mr. Pariseault submitted a number of discovery and inspection motions. Most of these requests were disposed of orally by the Court at the October 31, 1983 hearing on the defendants' motions. The motions not disposed of at that time included requests to be furnished with records of electronic surveillance and the photographs viewed by prosecution witnesses, as well as a motion to suppress any recordings or photographic evidence against Mr. Pariseault. The Court assumes that any *Brady* material or additional discovery material that is required by the defendant to prepare for trial will be provided in accordance with the customary practice in this district. Defendant's motion to suppress is denied.

*Conclusion*

The foregoing constitutes the Court's rulings on the motions submitted by each of the alleged contemnors. All of the defendants' motions are denied.

This case is set for a jury trial before this Court on May 14, 1984 at 10:00 A.M. in courtroom 705. All parties and counsel will be ready for trial as of that date.

So Ordered.