780 F.2d 179
 54 USLW 2348, 228 U.S.P.Q. 409
 UNITED STATES of America ex rel. VUITTON ET FILS S.A., and
Louis Vuitton S.A., Appellee,
v.
Barry Dean KLAYMINC, Nathan Helfand, George Cariste, Sol N.
Klayminc, and Gerald J. Young, Appellants.
 Nos. 1294, 1305, 1312, 1351, 1354, Dockets 85-1068, 85-1075
to 85-1078.
 United States Court of Appeals,
Second Circuit.
 Argued June 14, 1985.
Decided Dec. 16, 1985.
 
 James A. Cohen (Washington Square Legal Services, Inc., New York City, Paul Davison, Samia Fam, Lauren G. Gross, Michael Abelson, Carla Hinton, Legal Interns, New York University School of Law, of counsel), for appellant Barry Dean Klayminc.
 Thomas R. Matarazzo, Brooklyn, N.Y., for appellant N. Helfand.
 Mitchel B. Craner, New York City, for appellant G. Cariste.
 William P. Weininger, New York City (Samuel & Weininger, New York City, Walter Kraslow, New York City, of counsel), for appellant Sol N. Klayminc.
 Leonard J. Comden, Tarzana, Cal. (Wasserman, Comden & Casselman, Tarzana, Cal., of counsel), for appellant G. Young.
 J. Joseph Bainton, New York City (Robert P. Devlin, Steven H. Reisberg, Karen J. Pordum, Law Student, New York City, of counsel), for appellee.
 Before LUMBARD, OAKES and WINTER, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 Sol Klayminc and four confederates appeal their convictions on a jury verdict for criminal contempt under 18 U.S.C. Sec. 401(3) (1982), based upon violations, or the aiding and abetting of violations, of a permanent injunction of the Southern District, filed July 30, 1982, which prohibited infringement of the trademark of Louis Vuitton S.A., the well-known French manufacturer of high fashion handbags and other leather goods. The appellants received sentences ranging from six months to five years. Central to their appeals is the claim that the district court's appointment of Vuitton's attorneys as special prosecutors under Fed.R.Crim.P. 42(b) violated appellants' due process right to a disinterested prosecutor and that the court exceeded its authority by approving the special prosecutors' use of a "sting" operation fashioned along the lines of Abscam.
 
 
 2
 We find that the district court acted within its discretion in appointing Vuitton's attorneys to prosecute, and that it was within the court's authority to approve a sting operation. As none of the other claims of error require reversal of any of the convictions, we affirm the judgments of the district court.
 
 
 3
 Because Judge Brieant has discussed the case extensively in two opinions, United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc., 592 F.Supp. 734 (S.D.N.Y.1984) ("Vuitton I "), and United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc., 602 F.Supp. 1052 (S.D.N.Y.1985) ("Vuitton II"), and because we agree with his rulings, we briefly recapitulate the history of Vuitton's efforts to protect its trademark from infringement by counterfeiters.
 
 
 4
 Vuitton first brought suit in the District Court for the Southern District in December, 1978, against Sol Klayminc and his family-owned businesses, Karen Bags, Inc. and Jade Handbag Co., Inc., alleging that they were manufacturing imitation Vuitton goods for sale and distribution. Vuitton obtained a preliminary injunction the same month. Sol's wife, Sylvia, his son Barry, and Jak Handbag, Inc., another family owned business, were subsequently joined as defendants. Proceedings were then stayed to await the outcome of litigation in the Ninth Circuit regarding the validity of Vuitton's trademark. After the trademark was found valid in Vuitton et Fils S.A. v. J. Young Enterprises, 644 F.2d 769 (9th Cir.1981) the parties, in July 1982, entered into a settlement agreement pursuant to which the defendants agreed to pay Vuitton $100,000 in damages. Defendants also consented to the issuance of a permanent injunction which enjoined them from, inter alia, "manufacturing ... selling, offering for sale ... any product bearing any simulation ... of Vuitton's Registered Trade-Mark 297,594."
 
 
 5
 In early 1983, Vuitton, Gucci Shops, Inc., the manufacturers of Calvin Klein jeans and certain other owners of prestigous trademarks were contacted by Kanner Security Group, Inc., a Florida investigation firm whose principals are former FBI agents. Kanner proposed a plan to ferret out possible infringers by means of a "sting operation" subsequently dubbed "Bagscam"; the firm was subsequently retained. The main operatives in this sting operation were Melvin Weinberg and Gunner Askeland, a former FBI agent, both of whom had been involved in Abscam. Operating under the supervision of Vuitton attorney J. Joseph Bainton, Weinberg and Askeland posed as purchasers of counterfeit goods (using the assumed names "Mel West" and "Chris Anderson") and in this way they penetrated a network of counterfeiters that included Sol and Barry Klayminc and the other appellants.
 
 
 6
 Weinberg, posing as "Mel West", had a number of telephone conversations with appellant Nathan Helfand in which Weinberg explained that he and Askeland were interested in buying counterfeit goods. Helfand told Weinberg that he would talk to a man named "Sol" who had been in trouble with Vuitton in the past, but was planning to produce counterfeit Vuitton and Gucci goods in Haiti.
 
 
 7
 Helfand had a dinner meeting with Sol and Sylvia Klayminc in Florida on March 27, 1983 at which they discussed the sale by Sol of counterfeit Vuitton and Gucci wares and the possible investment by Weinberg and Askeland in the Haitian factory. Sol signed a memorandum describing in detail the present and proposed nature of the operation at the factory and another memorandum detailing the anticipated cost to Weinberg and Askeland of the counterfeited goods. At this meeting Sol also delivered to Helfand some sample counterfeit Vuitton bags for Weinberg's and Askeland's inspection. Sol explained to Helfand that additional imitation Vuitton products purchased from Sol could be picked up from a man named "George" (appellant George Cariste) in New Jersey. Sol also stated that his son, Barry, had a 25 percent interest in the Haitian operation. From the reported conversations it was apparent that both he and his confederates were aware of the permanent injunction.
 
 
 8
 On March 31, 1983, Bainton requested the court to appoint him and his associate Robert P. Devlin as special prosecutors in a criminal contempt proceeding pursuant to Fed.R.Crim.P. 42(b). Bainton's affidavit recited in detail the developments summarized above, which Helfand had reported to Askeland and Weinberg. Bainton pointed out that both he and Devlin had previously been appointed by the court to prosecute Sol Klayminc for criminal contempt.[1]
 
 
 9
 Judge Lasker, acting in place of Judge Brieant (the assigned judge who was absent), found on the strength of Bainton's affidavit that there was probable cause to believe that the alleged criminal contemnors were knowingly in violation of the court's permanent injunction; he appointed Bainton and Devlin to prosecute the case in an order dated March 31, 1983.
 
 
 10
 Desiring to sew up the case, but concerned about the ethical prohibition against private attorneys making surreptitious recordings, see 20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 747 F.2d 81, 93 n. 17 (2d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 337 (1974), Bainton also sought the court's permission to continue the undercover investigation and videotape the results. He detailed in his affidavit the next step in the investigation: a meeting arranged to take place at the Plaza Hotel in New York on April 5, 1983, among Sol, Barry, Askeland, and Weinberg to which Sol had been requested to bring twenty-five counterfeit Vuitton bags. The court's order empowered counsel to undertake "further investigation" of the alleged counterfeiting and to follow through with the activities detailed in Bainton's affidavit.
 
 
 11
 When Judge Brieant returned, Bainton, on April 6, apprised him of Judge Lasker's order and the continuing investigation. Judge Brieant suggested that Bainton bring the investigation to the attention of the United States Attorney's Office. By letter dated that same day, Bainton informed Lawrence Pedowitz, the Chief of the Criminal Division of the United States Attorney's Office for the Southern District, of the investigation and offered to make any tape recordings or other evidence available to his office.[2] Pedowitz did not take any action, but simply wished Bainton good luck. Judge Brieant noted that the United States Attorney's Office was again contacted about the case on the eve of trial, but indicated no desire to enter the case.
 
 
 12
 Thus, approved by court order, "Bagscam" went into full operation. Over the course of a month, numerous video and audio tape recordings were made of meetings and phone calls between appellants and the investigatory team. These recordings later enabled the jurors to see and hear a graphic account of the meeting at the Plaza Hotel on April 5 and the sale, for $25.00 apiece, of 25 imitation Vuitton bags to "Mel" by Sol. Mel later put up $5,000 to help Sol get his Haitian factory going to make more "L's" or "LV's", as the counterfeit bags were known.
 
 
 13
 Based, in part, on his April 26, 1983 report to Judge Brieant describing the contents of the recordings, Bainton requested, and the judge signed, an Order to Show Cause why the five appellants, as well as several corporate entities and two other individuals, David Rochman and Robert Pariseault, should not be cited for civil and criminal contempt for either violating or aiding and abetting the violation of the July 30, 1982 permanent injunction.
 
 
 14
 The defendants filed pre-trial motions opposing the Order to Show Cause and the appointment of Bainton and Devlin as special prosecutors. Oral argument was heard October 31, 1983. On April 9, 1984, Judge Breiant denied all the pre-trial motions. Vuitton I, supra. Rochman and Pariseault subsequently entered guilty pleas.
 
 
 15
 At the jury trial before Judge Brieant in May 1984 the government presented its evidence regarding the tapes and conversations through Weinberg and Rochman. Weinberg was extensively cross-examined for three days.
 
 
 16
 The defense presented no testimony contradicting any of the events detailed in the videotapes and in Weinberg's testimony. Sol Klayminc, Barry Klayminc, Nathan Helfand and Gerald Young did not take the stand. The only defendant who testified was George Cariste, who claimed that he had no knowledge of the court's injunction.
 
 
 17
 Following their convictions by the jury, defendants submitted post-trial motions. On January 24, 1985, Judge Brieant denied the motions. Vuitton II, supra.
 
 
 18
 Defendants claim on appeal that the special appointment of Bainton and Devlin violated their due process right to an impartial prosecutor. As a fallback, they contend that even if a court can appoint an interested attorney to prosecute a criminal contempt, the court does not have the power to invest that attorney with extraordinary investigative privileges. Appellants maintain that such privileges should be reserved for, and supervised by, experienced and accountable law enforcement authorities, not subject to abuse by private parties who seek to enhance their positions in related civil actions. To illustrate their concerns, appellants argue that Weinberg received sketchy instructions on how to conduct the "sting", that Weinberg both misrepresented the terms of the injunction to appellants and created ambiguities in the evidence, and that he asked numerous extraneous questions relevant not to the criminal contempt but to two civil proceedings: a $2.25 million defamation action by Sol Klayminc against Bainton and his law firm and Vuitton's challenge to Sol Klayminc's discharge of debts in voluntary bankruptcy.
 
 
 19
 Appellants' first argument founders on our decision in Musidor, B.V. v. Great American Screen, 658 F.2d 60 (2d Cir.1981), cert. denied, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982) where we held that it was proper for the district court to appoint as special prosecutor the counsel for civil plaintiffs in the copyright litigation that had resulted in the injunction allegedly violated. Appellants urge us to overrule Musidor. We decline to do so. The practice of appointing such counsel as prosecutor has a long history in this circuit. The attorney will usually be the court's only source of information about contempts occurring outside the court's presence. See McCann v. New York Stock Exchange, 80 F.2d 211, 214 (2d Cir.1935), cert. denied, 299 U.S. 603, 57 S.Ct. 233, 81 L.Ed. 444 (1936). Counsel for the plaintiffs are already fully informed and ready to go forward without delay. The district court is already aware of their competence and can make further inquiry if needed. Here, the qualifications of Bainton and Devlin were obvious and known to the court.
 
 
 20
 Appellants contend that in Musidor we did not fully appreciate the importance of the defendant's right to a disinterested prosecutor. The Musidor court, however, appropriately recognized that that right is not absolute. Although a prosecutor is charged with the duty not to win but to seek justice, Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), he hardly comes to the prosecution with an open mind. As we stated in Wright v. United States, 732 F.2d 1048 (2d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985) "If honestly convinced of the defendant's guilt, the prosecutor is free, indeed obliged, to be deeply interested in urging that view by any fair means. True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury--not the prosecutor." Id. at 1056 (citation omitted). The possibility that impermissible personal considerations may influence a prosecutor's decisions does not necessarily deprive a defendant of due process: "The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor and not the judge, who is offered an incentive for securing civil penalties." Marshall v. Jerrico, Inc., 446 U.S. 238, 248-49, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980).
 
 
 21
 We are not persuaded that Bainton and Devlin were disqualified by their past connections with Vuitton's business, their involvement in previous lawsuits with the defendants, or by any of their conduct in this lengthy litigation. The record reveals that the actions they took in the interests of their client and in support of the court's orders were fully justified by what they had discovered regarding the defendants' activities. The fact that Sol Klayminc had brought suit against Bainton in the New York courts alleging harassment and other acts is entitled to no weight as the suit was clearly frivolous; it was never pressed, and was finally dismissed by consent.
 
 
 22
 Prosecutors appointed under Fed.R.Crim.P. 42(b) are particularly susceptible of judicial control. They are under close judicial scrutiny as was the case here. By the very act of appointing a special prosecutor, the judge plays a key role in the decision about whether to prosecute. Hence, the prime danger that the special prosecutor will use the threat of prosecution as a bargaining chip in civil negotiations is practically nil.
 
 
 23
 Judge Brieant conducted the proceedings and the trial with a sharp eye toward ensuring that appellants were "accorded all the protections given to other criminal defendants." Vuitton I, 592 F.Supp. at 746. The Order to Show Cause, supported by Bainton's affidavit, gave ample notice that appellants were charged with criminal contempt under 18 U.S.C. Sec. 401(3) because of certain enumerated acts. Appellants had nearly thirteen months to prepare for trial. When they expressed concern that exculpatory Brady material might be within the Bainton/Vuitton attorney-client privilege, Judge Brieant ruled that such material would not be privileged. 592 F.Supp. at 746-47.
 
 
 24
 We are not persuaded by the recent opinion of the Sixth Circuit in Polo Fashions, Inc. v. Stock Buyers International, Inc., 760 F.2d 698 (6th Cir.1985). That court held that it is an abuse of discretion for a district court to appoint an attorney for a party in an underlying civil case as the sole or primary prosecutor in a related criminal contempt proceeding. The court emphasized that its holding was based on its supervisory authority over the Sixth Circuit. The court expressly did not decide that the appointment of an interested prosecutor in a criminal contempt proceeding violates the due process clause.
 
 
 25
 The government's case, relying as it did principally on tape recordings of what the defendants said and did, was so strong and convincing that the defendants can say little or nothing about the evidence except to complain that the court must not soil itself by approving the use of evidence obtained by deceit and misrepresentation. Defendants also argue that although such evidence might be received if it has been developed under the supervision of some government prosecutor, it ought not be received where appointed counsel acts as the prosecutor. Laying aside the obvious rejoinder that it ill becomes defendants who have shown so little regard for the majesty of the law and the orders of a federal court to be concerned about such matters, we find this argument to be completely without merit.
 
 
 26
 The special prosecutor should have the same power to gather evidence and present that evidence to the court as does any other government prosecutor. Appellants fail to cite any cases in which Rule 42 has been construed to limit the powers of the special prosecutor in this regard. In the absence of legislative history or some compelling reason that supports appellants' argument, we decline to draw a distinction between the United States Attorney and the court appointed prosecutor that is not contemplated by the literal language of Rule 42. The Rule's use of the term "to prosecute" applies to both types of government prosecutors mentioned therein and the common sense meaning of the term clearly encompasses the power to investigate and gather evidence through activities such as the Bagscam sting supervised by Bainton and Devlin.
 
 
 27
 Moreover, the district court was fully familiar with the use of evidence obtained through sting operations by virtue of this court's scrutiny and use of evidence similarly obtained in the Weinberg-managed "Abscam" sting. We affirmed convictions based on such evidence in United States v. Myers, 692 F.2d 823 (2d Cir.1982), cert. denied, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). See also United States v. Kelly, 707 F.2d 1460 (D.C.Cir.), cert. denied, 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); United States v. Williams, 705 F.2d 603 (2d Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983); United States v. Jannotti, 673 F.2d 578 (3d Cir.), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Nor is there any reason to believe that counsel who acted for the government in this case and who supervised the sting operation under the eye of the court and with its approval, did anything unethical or in violation of the Canons of Ethics. We therefore reject appellants' objections to the appointment of the special prosecutors and their supervision of the investigation.
 
 
 28
 Each of the appellants also challenges the sufficiency of the evidence supporting his conviction. We reject these challenges. Sol Klayminc obviously knew of the injunction since he consented to it. His conduct in selling the 25 counterfeit bags to Weinberg at the Plaza Hotel as well as his offering to sell in the United States counterfeit bags manufactured in Haiti clearly violated the injunction.
 
 
 29
 The four other appellants were tried and convicted of willfully aiding and abetting Sol Klayminc's violation of the injunction. See 18 U.S.C. Sec. 2(a) (1982). There is no doubt as to Barry Klayminc's knowledge of the injunction; Barry alleges, instead, that Judge Brieant incorrectly charged the jury on the standard for aiding and abetting and that, in any event, there was insufficient evidence of acts on his part aiding and abetting his father's violation of the injunction.
 
 
 30
 Conviction for aiding and abetting requires participation in an actual violation of the injunction, not just a plan to violate it. Barry argues that Judge Brieant erred in instructing the jury that it could convict defendants for aiding and abetting if, among other things, the jury found that defendants "did something ... in furtherance of a ... scheme or plan to violate the injunction order." Barry has unduly focused on one line of a long charge which accurately and completely informed the jury.
 
 
 31
 Because the scope of the injunction is very broad and prohibits even offers to sell counterfeit Vuitton goods, the jury could reasonably have found that Barry participated in actual violations of the injunction. Cariste testified that he and Barry met with Askeland and Weinberg on April 19, 1983 to discuss a plan to offer counterfeit Vuitton bags for sale in the United States. Later, Barry telephoned Cariste to request that he cut patterns for the Vuitton dies. Barry also aided his father's attempts to secure Weinberg as a buyer of imitation Vuitton goods by assuring Weinberg that Barry would take over for Sol if Sol became unable to manage the Haitian factory.
 
 
 32
 There was no reason for Judge Brieant to charge the jury, as Barry argues, that the injunction prohibited only contractual offers to provide counterfeit Vuitton goods. In the absence of any indication that the injunction intended anything but the commonly understood meaning of the term "offer", the judge's failure to give the requested instruction was not error.
 
 
 33
 There was also ample evidence to support the other convictions. Young had a longstanding relationship with Sol Klayminc and his statement that "if [Klayminc] would have listened to me, he wouldn't have had those troubles" (Tape 2, April 14, 1983) supports the inference that Young knew of the injunction. Young also argues that Judge Brieant erred in admitting, under the co-conspirator exception to the hearsay rule, evidence of a telephone conversation between Weinberg and Sol Klayminc in which Klayminc discussed Young's involvement in civil litigation with Vuitton in California. We think that the evidence was properly admitted as Young's prior experience with Vuitton litigation was relevant to the question of his knowledge of Klayminc's injunction. Nor may Young complain that the judge failed to instruct the jury of Young's ultimate "withdrawal" from the Haitian counterfeiting project. Even if we accept Young's assertion that he withdrew, this would not be a defense because the purported withdrawal took place after Young had committed the various acts of contempt for which he was convicted.
 
 
 34
 That Cariste had knowledge of the injunction is supported by Cariste's close association with Sol Klayminc at the time the injunction was entered in 1982 and by the trial testimony of Weinberg and David Rochman. Weinberg testified that Cariste had told him that Klayminc sold his Vuitton dies to Cariste when Klayminc first got in trouble with Vuitton. Rochman testified that Cariste had mentioned the injunction at an April 12, 1983 meeting. Cariste participated in meetings with Askeland and Weinberg at which the parties discussed the manufacturing of counterfeit Vuitton goods and it was Cariste who supplied the 25 imitation bags to Sol for sale at the April 5, 1983 meeting at the Plaza Hotel.
 
 
 35
 Helfand was a close associate of Sol Klayminc and he knew that Klayminc had had trouble with Vuitton in the past. Rochman testified that in the first week of April, 1983 he and Helfand discussed Sol Klayminc's counterfeiting operation and the fact that Klayminc was at that time under an injunction prohibiting him from infringing Vuitton's trademark. In light of the evidence of Helfand's knowledge of the injunction and of his activities as go-between for Weinberg and Sol Klayminc, there was ample evidence to support his conviction.
 
 
 36
 Finally, each appellant challenges the propriety of the sentence imposed on him. The primary contention here is that Judge Brieant relied upon an improper consideration--the vindication of Vuitton's property rights--in passing sentence. While the fundamental consideration in punishing criminal contempt is protecting the court's authority, it is also appropriate for a court to consider both the consequences of the violation of the injunction and the importance of deterring such acts in the future. See United States v. United Mine Workers of America, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The sentences imposed by the judge reflect a range of punishment that comports with each defendant's culpability. In light of the defendants' deliberate flaunting of the law over an extended period of time and in light of their calculated acts in violation of the court's injunction, the sentences are not excessive.
 
 
 37
 We have considered the other arguments raised by the appellants and find them to be without merit.
 
 
 38
 Judgments affirmed.
 
 
 39
 OAKES, Circuit Judge (dissenting).
 
 
 40
 I am required to dissent.
 
 
 41
 In my mind, the most difficult question that this case presents is whether it is legitimate for a court in the exercise of its criminal contempt powers to place its imprimatur on a sting operation that has already begun under the supervision of private attorneys and that will continue to run without effective judicial oversight. In the court below, Judge Brieant found that Judge Lasker's earlier approval of such an operation was appropriate and also saw no reason why it should matter whether an investigation occurs before or after the court appoints a special prosecutor, so long as the investigation proceeds with respect for defendants' constitutional rights. United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc., 592 F.Supp. 734, 743 (S.D.N.Y.1984) (Vuitton I); see also United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc., 602 F.Supp. 1052, 1055-56 (S.D.N.Y.1985) (Vuitton II). I see the issue as slightly more complicated. I believe the timing of the appointment and the extent of judicial oversight are of critical importance. Moreover, I believe that there are compelling reasons against court approval of such an operation: the private lawyer who participates in a sting operation almost necessarily runs afoul of the canons of legal ethics; the private lawyer who represents an interested party also lacks the knowledge of legal constraints on the investigatorial process and freedom from bias that a public prosecutor would have. A court should approve a sting operation only when it has determined that there is a strong showing that a court order has been violated and where there is no other way of catching the contemners. Such approval should also be conditioned on observance of strict guidelines.
 
 
 42
 Judge Lasker's decision to authorize further investigation on the part of Vuitton is certainly understandable. This court had already held that in criminal contempt proceedings counsel for interested parties may in appropriate circumstances be appointed special prosecutors. See Musidor, B.V. v. Great American Screen, 658 F.2d 60 (2d Cir.1981), cert. denied, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982). Moreover, Sol Klayminc had previously violated a court order barring him from counterfeiting Vuitton goods. Nonetheless, attorneys for Vuitton should not have been vested with the investigatory powers of prosecutors. As indicated above, a number of factors must be balanced against the interest in catching contemners, and, in this case, those factors should have been found to be predominant.
 
 
 43
 Thus, in a situation such as this, the court should have considered the possibility that Vuitton's campaign against would-be counterfeiters would not be thwarted by denying its attorneys sweeping investigatory powers. First, other methods of investigation would remain open. For instance, in Musidor, 658 F.2d 60, the key testimony came from a private investigator who never practiced any deception: he conducted surveillance, trailed a van, and purchased one of the items bearing the protected trademark from the back of the van. Second, a company like Vuitton, that has proved over and over again just what kind of counterfeiters it is up against, see In re Vuitton et Fils S.A., 606 F.2d 1, 2 (2d Cir.1979), could conceivably obtain judicial authorization before beginning the sting, although several cases and commentators have advanced the convincing contention that sting operations may be justified only to combat activities threatening "grave harm to our society," such as the corruption of public officials. United States v. Kelly, 707 F.2d 1460, 1473 (D.C.Cir.), cert. denied, 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); see also United States v. Myers, 692 F.2d 823, 843 (2d Cir.1982), cert. denied, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983); Blecker, Beyond 1984: Undercover in America--Serpico to Abscam, 28 N.Y.L.Sch.L.Rev. 823, 975-82 (1984).[1]
 
 
 44
 Another factor to be considered in a case such as this is whether the court should refuse to approve an ongoing investigation in which lawyers may have previously violated ethical norms (as it appears, concededly in hindsight, Vuitton's lawyers did here). A lawyer has the general duty not to "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Model Code of Professional Responsibility DR 1-102(A)(4) (1980); see also Model Rules of Professional Conduct Rule 8.4(c) (1983). He also has the specific duty not to "knowingly make a false statement of law or fact." Model Code DR 7-102(A)(5); see also Model Rule 4.1(a). These duties of lawyers exist even when the lawyers are not acting in their capacity as such. See ABA Comm. on Ethics and Professional Responsibility, Formal Op. 336 (1974) (duties of lawyers in respect to Watergate activities). In the words of Justice Frankfurter,
 
 
 45
 It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."
 
 
 46
 Schware v. Board of Bar Examiners, 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring). I believe that the duty to refrain from conduct that involves dishonesty, fraud, deceit, or misrepresentation and the duty to speak the truth should preclude a private attorney from participating in a sting operation without first receiving court approval. Moreover, those fundamental tenets of the legal profession mandate that such approval be granted rarely and only under exceptional circumstances.
 
 
 47
 Nor is it available to argue that the chicanery here was performed by an investigative firm rather than by counsel themselves. As attorney Bainton's affidavit in support of his motion seeking appointment as a special prosecutor and judicial approval of the investigation makes clear, these operations were conducted with his knowledge and approval. In addition, there is some suggestion in the record that the course of conduct by the Kanner security firm was not only ratified by Vuitton's counsel, but that it was in part directed by them. In either case, attorneys who employ such a firm must be held to bear responsibility for the firm's use of techniques that would be ethical violations if utilized by the attorneys directly. Lawyers cannot escape responsibility for the wrongdoing they supervise or ratify by asserting that it was their agents, not themselves, who committed the wrong. The history of Watergate eloquently demonstrates that lawyers have the capacity to perpetrate lawlessness by directing the behavior of others; the conviction of certain of Watergate's lawyer-defendants, see, e.g., United States v. Ehrlichman, 546 F.2d 910 (D.C.Cir.1976) ("plumbers' " break-in at Ellsberg's psychiatrist's office), cert. denied, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977); United States v. Liddy, 509 F.2d 428 (D.C.Cir.1974) (original Watergate break-in and wiretapping), cert. denied, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975), evidences the fact that the lawyer who guides others into or profits by illicit behavior bears responsibility for acts done under his supervision. Such responsibility accords with agency law. See Restatement (Second) of Agency Sec. 217D (1957) (principal may be subject to penalties for criminal acts of agents). It accords with the canons of legal ethics. See Model Rule 5.3 (lawyer responsible for the misconduct of nonlawyer employees or associates if the lawyer orders or ratifies the conduct); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1320 (1975) (deeming it unethical for lawyer to have his investigator tape colloquy with sales clerk without clerk's knowledge). Most basically, it accords with the obligations and duties of lawyers in our society.
 
 
 48
 In reviewing Vuitton's attorney's application for approval of the investigation, the court should also have considered the possibility of imposing guidelines for and limitations on that investigation. If such an operation is to be approved, guidelines are necessary. Respect for the court, the end goal of contempt, may be diminished when a court approves an open-ended investigation by attorneys unrestrained by either institutional guidelines or the court's own specific guidance. The Rule 42 order read in part (emphasis added): "Ordered that J. Joseph Bainton, Esq., and Robert P. Devlin, Esq., ... are hereby specially appointed to represent the United States of America in connection with the further investigation of the alleged aforesaid criminally contumacious course of conduct and the ultimate prosecution therefor ...." Obviously, such a broad order must be construed to permit only lawful investigations, and I will assume that Bainton and Devlin so understood it. See Vuitton I, 592 F.Supp. at 743. Indeed, the attorneys, to their credit, anxious to remain within the bounds of California law, did secure the supervision of the Los Angeles District Attorney over their electronic eavesdropping in California. But a lawful investigation may still fall far short of the careful investigation a judge would or should approve in advance; once the evidence is in, courts have a "well-established reluctance to dismiss criminal prosecutions because of faulty Government investigation." United States v. Myers, 692 F.2d at 843. The standard appropriate in reviewing a completed investigation is not, however, the appropriate one for a court to use when it approves an investigation in advance. In the latter situation, there is no reason for the court not to require that the investigation be conducted with the utmost scrupulousness and respect for individual rights.
 
 
 49
 There are, however, I hasten to add, certain inherent problems with the decision to authorize an investigation conducted by attorneys for private parties. When there is a history of bitter litigation between the parties under investigation and the clients of the attorneys conducting the investigation, as there is in this case, a certain amount of animus against those being investigated on the part of the attorneys is all but inevitable. At the same time, those attorneys will frequently lack knowledge of all the limits that our laws require prosecutors to observe. Through inclination and ignorance, as well as lack of responsibility to the public, to higher authorities or to an electorate, or a combination of these, private attorneys are likely to fail to exhibit the self-restraint in conducting an investigation and the candor in admitting errors that are required of prosecutors and are of critical importance if our system is to work properly. Indeed, just such an argument was utilized in Judge Lumbard's and my recent RICO opinion in Sedima, S.P.R.L. v. Imrex Co., 741 F.2d 482, 497 (1984), reversed on other grounds, --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Attorney Bainton's affidavit in support of his motion seeking judicial approval of the investigation illustrates the problems with placing too great a faith in interested private attorneys. That affidavit clearly indicates that the court order barring counterfeiters was being violated. My reading of the record indicates instead that the defendants here had probably not violated the earlier order at that time and that the investigation may have been the proximate cause of the violation. Hindsight at least demonstrates the need for caution.
 
 
 50
 In the end, I am concerned not so much by this case--much less by these defendants' plights--as by the thought that courts may put their stamps of approval on whatever undercover tactics lawyers or their hired investigators may devise short of the outrageous or illegal. Authorizing the nearly-outrageous and barely legal can hardly be said in the long run to preserve the dignity of the courts or secure their position of respect.
 
 
 51
 It is my belief, therefore, that the decision authorizing Bainton and Devlin to continue their investigation was incorrect. Accordingly, I would reverse the judgment.
 
 
 
 [1]
 Judge Brieant had appointed Bainton and Devlin on July 8, 1981 to prosecute Sol Klayminc and his family-owned businesses for their criminally contemnacious conduct in selling counterfeit Vuitton goods in defiance of the court's December 12, 1978 preliminary injunction. The case was tried as a petty offense before a United States Magistrate on July 22, 1982. Klayminc and the corporate defendants were convicted, but the Magistrate suspended the sentences upon hearing that the underlying civil action had been settled
 
 
 [2]
 Because the investigation required some undercover work in California, Bainton also contacted John Kildebeck of the District Attorney's Office in Los Angeles to discuss the California law applicable to planned electronic eavesdropping by federal agents. Kildebeck confirmed that the planned investigatory activities would present no problem under California law
 
 
 [1]
 I note that after the order issued in this case, remedies against counterfeiters were unquestionably strengthened by the Trademark Counterfeiting Act of 1984, Pub.L. No. 98-473, Secs. 1501-1503, 98 Stat. 2178 (codified at 15 U.S.C.A. Secs. 1116-1118, 18 U.S.C.A. Sec. 2320 (West Supp.1985)). In future cases, this law must be taken into account in considering the alternate remedies available to trademark holders