Bobby L. PERSON, United States of America, Plaintiffs–Appellees,

v.

Glen F. MILLER, Defendant–Appellant,

and

Carolina Knights of the Ku Klux Klan, an unincorporated association; Jerry Michael Lewis; Joan Short; Gregory Short; Charles Cox; Gordon Ipock; Stephen Miller; Robert Stoner; Vince Witt; Tommy Driggers; Boyd Maloney; Beauford Ogle; Tony Henricks; Culbert Wilkerson; Sterling Henson; Richard Pounder; Ken Penley; Ricky Nunnery; Tony Sheldon; Jeff Johnston; Jeff Cartrett, Defendants.

No. 86–3882.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 1, 1988.

Decided Aug. 16, 1988.

Rehearing and Rehearing In Banc Denied Sept. 13, 1988.

Thomas Ralph Scott (Street, Street, Street, Scott & Bowman, Grundy, Va., on brief), for defendant-appellant.

Irving Gornstein, Dept. of Justice, Civil Rights Div., Washington, D.C. (J. Douglas McCullough, Acting U.S. Atty., Raleigh, N.C., William Bradford Reynolds, Asst. Atty. Gen., David K. Flynn, Dept. of Justice, Washington, D.C., Morris Dees, Southern Poverty Law Center, Montgomery, Ala., on brief), for plaintiffs-appellees.

Before RUSSELL, PHILLIPS and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Glen Miller challenges a judgment finding him in contempt of a court order prohibiting him from operating a paramilitary organization and doing certain other acts prohibited by North Carolina law. He raises a number of issues on appeal, principally that there was insufficient evidence to support the finding of contempt; that the court's appointment of counsel for an interested party to prosecute the action violated the Supreme Court's rule established in *Young v. U.S. ex rel. Vuitton Et Fils S.A.*, — U.S. ——, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987); that the district court should have excused for cause all potential jurors who were beneficiaries of the court order allegedly violated; that the district court should have granted Miller's motion for a separate trial from his co-defendant, Stephen Miller; and that the district court allowed the admission of irrelevant and unfairly prejudicial evidence against Miller. We believe that these and Miller's other contentions are without merit and therefore affirm.

I

In June 1984, Bobby Person, a black citizen of the United States and the State of North Carolina, filed a class action against the Carolina Knights of the Ku Klux Klan (CKKKK), its leader, Glen Miller, and other named and unnamed individuals associated with the CKKKK. The suit alleged that the defendants had engaged in a series of violent and intimidating acts throughout North Carolina with the purpose of preventing black citizens and others acting in concert with them from freely exercising their rights under state and federal law. The district court ultimately certified a class consisting of "all black citizens in the State of North Carolina who seek to exercise their state and federal

rights free from interference by the defendants."

In January 1985, the parties entered into a consent decree which prohibited Miller and the CKKKK from, among other things, "operat[ing] a paramilitary organization and do[ing] other acts prohibited by North Carolina General Statutes 14–288.20(b)(1)[1] and (b)(2)[2] and North Carolina G.S. 14–10."[3] The agreement also authorized "the Court to enter an Order encompassing the terms and conditions of the agreement." On January 18, 1985, the court held a hearing on the terms of the consent agreement, attended by Person's counsel and Miller. The order was entered later that day. In September 1985, after the giving of constructive notice by publication to class members, the court made the decree final as to Miller, the CKKKK, and its successor organization, the White Patriot Party (WPP). Miller had changed the name of the organization after the entry of the court's order in January 1985.

In April 1986, Person's counsel, Morris Dees, moved, on a supporting complaint, to cite Miller and the WPP for criminal contempt of court. The complaint alleged that Miller and the WPP had violated the court's order by operating a paramilitary organization and engaging in conduct violative of § 14–10. The complaint was later amended also to allege a violation of the order because Miller and the WPP had operated a paramilitary organization and engaged in conduct violative of § 14–288.20(b)(1). The district court ordered Miller and the WPP to show cause why they should not be found in contempt and set a hearing for July 1986.

Dees was initially authorized by the court to prosecute the contempt action. From the time that the original complaint was filed until June 1986, Dees was actively engaged in preparing the case. He filed several amendments to the original complaint, moved the court to add various parties as defendants, one of which was Stephen Miller, and conducted discovery. In June 1986, counsel for Miller moved to have Dees disqualified on the grounds that Dees would be a material witness at trial and that Dees' appointment as prosecutor violated the North Carolina Rules of Professional Conduct and Miller's right to be prosecuted by an impartial prosecutor as guaranteed by the Due Process Clause.

Noting a conflict in recent circuit court decisions on whether counsel for an interested party could prosecute a related criminal contempt action, specifically *United States ex rel Vuitton et Fils S.A. v. Klayminc*, 780 F.2d 179 (2d Cir.1985) (appointment not improper) and *Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.*, 760 F.2d 698 (6th Cir.1985) (district court abused discretion by appointing interested prosecutor), the court ordered that the prosecution would be under the "direct supervision and control" of the United States Attorney's Office for the Eastern District of North Carolina. The court further ordered that Dees could "assist the United States Attorney prior to and during the course of the trial." Shortly after the entry of the court's order, the prosecution filed a composite complaint against Glen Miller and the WPP which was signed by the United States Attorney for the Eastern District of

---

**1.** N.C.Gen.Stat. § 14–288.20(b)(1) provides that a person is guilty of a felony if he

[t]eaches or demonstrates to any other person the use, application, or making of any firearm, explosive or incendiary device, or technique capable of causing injury or death to persons, knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder.

**2.** N.C.Gen.Stat. § 14–288.20(b)(2) provides that a person is guilty of a felony if he

[a]ssembles with one or more persons for the purpose of training with, practicing with, or being instructed in the use of any firearm, explosive or incendiary device, or technique capable of causing injury or death to persons, intending to employ unlawfully the training, practicing, instruction, or technique for use in, or in furtherance of, a civil disorder.

**3.** N.C.Gen.Stat. § 14–10 makes it unlawful for any persons to

band together and assemble to muster, drill or practice any military evolutions except by virtue of the authority of an officer recognized by law, or of an instructor in institutions or schools in which such evolutions form a part of the course of instruction.

North Carolina and Dees. The case came to trial in late July 1986.

At trial, the prosecution presented James Holder and Robert Jones as key witnesses. Holder was a member of the CKKKK in 1982 and 1983. He testified that Miller's ultimate goal was to overthrow the government, beginning with taking control of a large part of the south. This plan was apparently based on a fictional book, *The Turner Diaries*, which describes the overthrow of the government in 1991 by a white supremacist group known as "The Order." Holder explained that Miller regarded the book as a guide for his organization and actively recommended that all members read it. Holder himself was in charge of providing military training for the CKKKK and engaged in exercises which included weapons and tactical training. The purpose of these exercises was to prepare for Miller's plan to overthrow the government.

Jones testified that Miller asked him to assist in the CKKKK's training and to help acquire weapons and explosives for the group. Miller apparently left the details of these activities to be worked out by Jones and Miller's subordinates, including Stephen Miller. Jones undertook to supply the WPP with various firearms, explosives, and other military equipment as well as provide training in the use of these items. He continued this activity until his arrest in July 1985. Jones testified that he met with Miller after his arrest and that Miller asked him not to disclose any information to the authorities, silence for which he offered to pay Jones $1300 per month.

On this and the other evidence, the jury convicted Miller of (1) operating a paramilitary organization and violating N.C.Gen. Stat. § 14–288.20(b)(1), and (2) operating a paramilitary organization and violating N.C.Gen.Stat. § 14–10.

This appeal followed.

## II

Miller first raises a number of issues all relating to whether there was sufficient evidence for the jury to find him in criminal contempt of court: that the prosecution failed to prove the existence of the order that he allegedly violated, an essential element of a contempt conviction; that the prosecution failed to prove that he simultaneously operated a paramilitary organization and violated all three listed North Carolina statutes, which Miller claims is the only way that he could violate the order; that the prosecution did not prove that he violated either § 14–288.20(b)(1) or § 14–10; and that the prosecution failed to prove that he acted willfully in violation of the order because it is not clear and definite in its terms. We take these contentions in turn.

### A

██ An essential element of a contempt conviction is that the prosecution show that the defendant violated a valid court order. *Richmond Black Police Officers Ass'n v. City of Richmond*, 548 F.2d 123, 129 (4th Cir.1977). Miller correctly notes that the prosecution did not introduce the court's January 18, 1985 order into evidence. The district court did, however, take judicial notice of the order and placed it before the jury for consideration in its deliberations. And while Miller complains that the prosecution did not request that the court take judicial notice of the order, such a request is not a necessary prerequisite of judicial notice. Fed.R.Evid. 201 provides that "[a] court may take judicial notice [of an appropriate fact], whether requested or not." We think that the district court was well within its discretion to take judicial notice of its order and by this means to lay it before the jury for consideration.

### B

██ Miller's next contention turns on a change in the wording of the order. The original draft of the settlement agreement entered into between Person and Miller prohibited Miller from: "operat[ing] a paramilitary organization *or* do[ing] certain other acts prohibited by North Carolina General Statutes 14.288–20(b)(1) and (b)(2) and North Carolina G.S. 14–10." (Empha-

sis added.) At Miller's insistence, and with the agreement of Person's counsel, this passage was changed to read: "operat[ing] a paramilitary organization *and* do[ing] other acts ..." (same). This change was then incorporated into the court's January 18, 1985 order. Miller here argues that this change from the disjunctive "or" to the conjunctive "and" establishes that the parties intended that a violation of the order involve the operation of a paramilitary organization coupled with the simultaneous violation of all three listed North Carolina statutes.

But Miller himself admits that the word "and" can be used in the conjunctive or disjunctive sense. *See United States v. Goodwin*, 637 F.2d 250, 256 (4th Cir.1981), *rev'd on other grounds*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). In this case, reading the word "and" in the disjunctive is strongly supported by the fact that each North Carolina statute proscribes an independently wrongful act. Miller's interpretation would mean that the court order gave Miller permission to violate some state laws, at least in relation to a violation of the order, so long as he did not violate all three listed statutes at the same time. Such an interpretation ignores the obvious and broad purpose of Person's suit and the resulting order, which was to prevent conduct impairing the exercise of class members' rights as protected by federal and state law. This purpose would be frustrated by the interpretation Miller urges.

Miller's argument also ignores the scope of the change. As originally drafted, the consent agreement as reasonably read prohibited the doing of any one of four independent acts: operating a paramilitary organization, violating § 14–288.20(b)(1), violating § 14–288.20(b)(2), or violating § 14–10. The change was simply intended to clarify that the operation of a paramilitary organization alone would not violate the agreement. Instead, this action would have to be done in conjunction with a violation of at least one of the three listed statutes to give rise to a violation of the order.

## C

Miller next contends that the prosecution failed to prove that he violated § 14–288.20(b)(1). Specifically, he argues that (1) the prosecution never proved he had direct involvement in any activities that would violate the statute, and (2) the prosecution did not show the immediate threat of a civil disorder.

■ The simple answer to Miller's first point is that it misperceives the prosecution's theory of the case. The prosecution never contended that Miller himself actively engaged in conduct violative of § 14–288.20(b)(1). Rather, the prosecution argued that the conduct was carried out by Miller's agents, Stephen Miller and others, under the direct orders of Miller as head of the CKKKK. The district court properly informed the jury in its instructions on the agency theory.

Miller counters by arguing that he approved the activities allegedly violative of § 14–288.20(b)(1) prior to the entry of the court order. On this point, the prosecution introduced evidence that Miller instructed his agents to engage in such activities indefinitely and that they continued past the entry of the order. Under such circumstances, and as leader of the CKKKK, Miller had an obligation to put a halt to the prohibited activities. We believe that the jury could reasonably infer that Miller knew the prohibited activities were continuing and that he tacitly approved their continuance in dereliction of his obligation pursuant to the court order.

■ Miller's second point is also without merit. Section 14–288.20(b)(1) proscribes the undertaking of certain activities with the knowledge or intent that they are "[f]or use in, or in furtherance of, a civil disorder." Miller accurately notes that a civil disorder is defined as

any public disturbance involving acts or violence by assemblages of three or more persons, which causes an immediate danger of damage or injury to the property or person of any other individual or results in damage or injury to the property or person of any other individual.

N.C.Gen.Stat. § 14–288.20(a)(1). He contends that the prosecution failed to show that he engaged in or ordered any acts threatening the requisite "immediate danger."

Miller's interpretation, however, would force us to rewrite § 14–288.20(b)(1) to read "immediate civil disorder." As written, the prosecution need only prove that the prohibited activities were engaged in with the intent of furthering a civil disorder at some point in time. We think that the prosecution produced ample evidence from which the jury could conclude that Miller intended that the prohibited activities were in furtherance of a plan to cause a civil disorder in the future.

■ Miller also argues that the prosecution did not prove that he violated § 14–10 because it did not show that the CKKKK was not authorized to conduct military evolutions or that it did not qualify for the school exemption from the prohibition on such conduct. Again, we think there was ample evidence from which the jury could find that Miller violated § 14–10.

The chief military officer of the State of North Carolina, General Charles Scott of the North Carolina National Guard, listed those organizations authorized to conduct military evolutions and the list did not include the CKKKK. He explicitly stated that neither Glen Miller, Stephen Miller, nor the WPP were to his knowledge authorized by law to conduct military operations in North Carolina. General Scott also testified that in addition to high school and college ROTC programs, the State has only one accredited military academy. Moreover, it is beyond peradventure that the school exemption to § 14–10's prohibition on engaging in military evolutions does not apply to a group like the CKKKK that is engaged in practicing guerilla warfare aimed at subverting the government. *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 591 n. 18, 103 S.Ct. 2017, 2028 n. 18, 76 L.Ed.2d 157 (1983) (for example, tax exemption for educational organizations would not apply to former band of military personnel who set up a school for training in guerilla warfare).

### D

■ Finally, Miller argues that the prosecution failed to prove that he willfully violated the court's order because it was not clear and definite in its terms. He claims that his interpretation of the order, as discussed in Part II(B) above, is at least reasonable, and thus precludes such a finding of willfulness.

As a threshold matter, we again question whether Miller's interpretation is reasonable. In any event, the questions of whether the order was clear and definite, as well as whether Miller intentionally and willfully violated it, were submitted to the jury and resolved against him. We believe that there was ample evidence to support the jury's findings. We note that Miller had referred in his newsletter to the consent decree as a "scrap of paper."

### III

Miller's next challenge involves the service of Morris Dees, counsel to Person in the underlying civil litigation, as special counsel to prosecute the contempt action against Miller. While in his pre-trial motion to disqualify Dees, Miller styled his claim as a Due Process violation, he only claims on appeal that Dees' appointment violated the rule established in *Young v. United States ex rel. Vuitton Et Fils S.A.*, —— U.S. ——, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

In *Young*, decided after the verdict in this case, the Supreme Court held that counsel for a party that is a beneficiary of a court order could not be appointed to prosecute a contempt action alleging a violation of that order. Bypassing the Due Process claim alleged by the petitioners, the Court grounded its holding in an exercise of its supervisory power.

*Young* obviously has relevance to the issue of Dees' authorized participation in the prosecution of the contempt citation in this case, but it is not dispositive because it dealt with a significantly different issue: whether a contempt prosecution can be turned over completely to private, interest-

ed counsel. The issue here is whether and, if so, to what extent, private counsel for interested parties may be authorized to participate with government counsel in such a prosecution.

*Young* flatly proscribes turning the prosecution completely over to private counsel for interested parties, but it certainly did not proscribe all participation by such counsel. Indeed, and to the contrary, the *Young* Court was at pains to point out that private counsel's greater familiarity with the case might properly "be put to use in *assisting* a disinterested prosecutor in pursuing the contempt action." *Young*, 107 S.Ct. at 2137 n. 17 (emphasis in original). The limits of such allowable assistance were also suggested: assistance may not extend to the point that "counsel for the private party [is] ... in control of the prosecution." *Id.*

██ We therefore read *Young* at least implicitly to approve (or certainly not to forbid) the practice of allowing private counsel for interested parties to participate formally with government counsel in the prosecution of contempt citations so long as that participation (1) has been approved by government counsel; (2) consists solely of rendering assistance in a subordinate role to government counsel; and (3) does not rise in practice to the level of effective control of the prosecution. As indicated, we find authority for this rule of limited participation at least implicit in *Young* and we think it wholly conformable to *Young*'s underlying principles. Accordingly, we adopt it as the appropriate rule governing the participation of private counsel for interested parties in contempt prosecutions.

██ Applying the rule to the facts of this case, we find no reversible error in the permitted participation of Dees in the contempt prosecution here in issue. Specifically, we conclude that the government's approval of Dees' participation, though belated, was timely and otherwise effective under the circumstances for the relevant purposes; that Dees' participation was limited in its total compass to assisting government counsel in a subordinate role; and that once government counsel timely as-

sumed effective control, Dees did not thereafter assume effective control by virtue of the nature and extent of his participation.

While conceding that *Young* did not proscribe any and all participation by Dees, Miller contends that in practical effect Dees functioned as "lead" or "primary" counsel—that, in our terms, he effectively, if not formally, controlled the prosecution. In support of this contention he asserts that (1) Dees singly conducted the prosecution until the case was referred to the United States Attorney's Office some two weeks prior to the original trial date; (2) Dees took substantially more time in opening and closing arguments than did government trial counsel; (3) Dees examined virtually all the significant witnesses, and (4) Dees made and responded to most of the objections and arguments at trial.

Accepting the essential accuracy of these assertions of the degree of Dees' participation, we do not think the issue is properly resolved on such a facile quantitative basis, or by efforts to determine who was "lead" counsel at trial. The critical question is who was in actual control of the prosecution—both formally and in practical effect. The quantitative division of trial work obviously has some relevance to that, but it cannot be decisive. We can conceive of situations in which without ever relinquishing effective control of the prosecution government counsel might for tactical reasons give over even more substantial portions of the actual conduct of trial to particularly skilled or knowledgeable private counsel.

The more appropriate analytic focus is on the evil at which the *Young* rule forbidding total abdication to private counsel for interested parties was aimed. That evil was the possibility that the criminal contempt sanction would be invoked and prosecuted by private counsel, operating in the adversarial mode, solely to secure advantage to his client and hence without regard for any interests of the defendant and the public in fairness of the criminal process. *Young*, 107 S.Ct. at 2136–37. That evil is sufficiently guarded against—both in appearance and reality—by the presence of disin-

terested government counsel effectively in a position and manifestly prepared to exercise control over the critical prosecutorial decisions—most critically, whether to prosecute, what targets of prosecution to select, what investigative powers to utilize, what sanctions to seek, plea bargains to strike, or immunities to grant. *Id.* It is control over these critical prosecutorial decisions which determine the fairness of particular prosecutions that is the important consideration; operational conduct of the trial is actually of subordinate concern, except as it may actually impact upon the more fundamental prosecutorial decisions.

Analyzed on this basis, Miller's contentions of effective control by Dees are not supported by the record. Though, as indicated, government counsel assumed control belatedly, there is no indication that once assumed it was ceded to Dees in any of the critical respects above identified. We must assume, both because of the general presumption of regularity that attaches to official conduct and because there is no disproof in the record, that when the district court formally directed that the United States Attorney was in control, and would be so considered by the court, that was and continued to be the reality. All of the formal indicia in the record from that point —the written submissions, oral colloquies, government counsel's continued physical presence—support the assumption that it was the reality. Nothing, other than the degree of Dees' participation in the actual conduct of the trial, is advanced to disprove it. As indicated, we do not believe this suffices.

Of course, the fact that in this case Dees instigated and for a time was in sole charge of the prosecution must give us some pause in light of *Young*'s direction that "a court ordinarily should first request the appropriate prosecuting authority to prosecute contempt actions" before authorizing private counsel to become involved. *Young*, 107 S.Ct. at 2134. Under the circumstances, however, that departure from preferred procedure does not require reversal. As indicated above, the court referred the matter to the United States Attorney immediately upon Miller's motion to dis-

qualify Dees. There is no suggestion that the United States Attorney at that point did not exercise an independent prosecutorial judgment in deciding to proceed on a new complaint nor that had he declined to proceed the district court would have continued to allow Dees to proceed alone. In fact, Miller does not actually point to any specific prejudice attributable to the interval of Dees' sole control, concentrating instead on his participation after government counsel assumed formal control. We are satisfied that in the future district courts will follow the rule we have derived from *Young* and make initial reference to the United States Attorney's Office before authorizing any participation in contempt prosecutions by private counsel. In this instance, we find no reversible error in the failure to do so.

## IV

Miller next argues that the district court erred by not excusing for cause all prospective black jurors on the basis that they were beneficiaries of the court order Miller was charged with violating. Miller claims that the court's action forced him to use his peremptory challenges to remove a number of black jurors and that, even given his use of these challenges, he was unable to remove all black jurors.

Challenges for cause are typically limited to situations where actual bias is shown. *United States v. Loucas*, 629 F.2d 989, 992 (4th Cir.1980). Even if bias may be implied in appropriate circumstances, *Smith v. Phillips*, 455 U.S. 209, 221–24, 102 S.Ct. 940, 948–50, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring), the doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances. This case does not present one of those extreme situations. *Compare Smith*, 455 U.S. at 222, 102 S.Ct. at 948 (noting some circumstances in which a finding of implied bias might be justified).

A criminal contempt proceeding is not simply the continuation of the private parties' civil litigation. Rather, it is a proceeding between the public and the defendant, *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 445, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911), that seeks to vindicate the court's authority. *Young*, — U.S. at —, 107 S.Ct. at 2133. In this case, potential black jurors, even as beneficiaries of the court order, have no greater interest in vindicating the court's authority than any other member of the general public who might also be called to serve as a juror. There is simply no pecuniary or other unique benefit to be gained by the beneficiary class from a finding of contempt. *Compare Young*, — U.S. at —, 107 S.Ct. at 2136 (beneficiary stood to benefit from finding of contempt as court order contained a liquidated damages provision for violation of the order). Whether or not Miller or the WPP were found in contempt, the injunction restricting their activities would continue in effect and inure to the benefit of class members.

In essence, Miller is suggesting that no black citizen could ever serve as an impartial juror in an action involving a white supremacist, group or individual, as a party. But this suggestion extends beyond the boundaries of class membership and proffers the imputation of bias to all those groups or individuals offended by the white supremacy movement. The appropriate way to raise such a wide ranging and generalized claim of bias is by showing actual bias, not by invoking the doctrine of implied bias.

■ Miller does challenge the district court's refusal to exclude for cause one juror on the basis of actual bias. Miller contends that juror James Farmer, a black man and admitted member of the NAACP, smiled or laughed when asked whether he could render a fair and impartial verdict.

A district court has wide discretion in the conduct of *voir dire, United States v. Robinson*, 804 F.2d 280, 283 (4th Cir.1986), as well as in deciding whether to excuse a juror for cause. *Loucas*, 629 F.2d at 992.

This discretion includes the evaluation of "potential jurors' inflections and gestures, as well as their actual words." *United States v. Griley*, 814 F.2d 967, 974 (4th Cir.1987). We do not believe that the district court abused its discretion in failing to excuse Farmer for cause, particularly in light of his repeated assertions that he was able to render a fair and impartial verdict on the evidence.[4]

## V

■ Miller next contends that the district court erred by denying his motion for severance. Miller sets forth a number of grounds in support of his claim: that the common surname shared by him and his co-defendant, Stephen Miller, was a source of confusion that, coupled with the complex nature of the evidence, resulted in a spillover to his prejudice of evidence implicating Stephen Miller; that he was prejudiced by Stephen Miller's *pro se* representation; that his defense was antagonistic to that presented by Stephen Miller; and that he was prevented from presenting exculpatory testimony from Stephen Miller.

The grant or denial of a motion for a severance is a matter committed in the first instance to the sound discretion of the trial court and that court's decision will not be overturned absent a clear abuse of that discretion. *United States v. Becker*, 585 F.2d 703, 706 (4th Cir.1978). Such an abuse of discretion will be found only where the trial court's decision to deny a severance "deprives the defendant[s] of a fair trial and results in a miscarriage of justice." *Id.* (citations omitted). Though the grounds cited by Miller can serve as the basis for the grant of a severance in an appropriate case, we note that neither the presence of antagonistic defenses nor a *pro se* co-defendant is prejudicial *per se. See, e.g., United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir.1985) (*pro se* defendant); *Becker*, 585 F.2d at 707 (antagonistic defenses). Guided by this narrow standard of review, we do not believe that the district court abused its discretion in denying

**4.** Miller ultimately exercised one of his peremptory challenges to remove Farmer.

Miller's motion for severance. We take his specific contentions in turn.

The case itself, contrary to Miller's characterization, is not overly complex. The case was prosecuted on the theory that Miller, by virtue of instructions given to his agents, including Stephen Miller, continued to engage in certain activities even though the court's order prohibited him from doing so. Much of the prosecution's case rested on the testimony of two key witnesses—Holder and Jones.

Nor do we believe that the presence of a common surname between the co-defendants caused undue confusion. The district court's opening instructions warned the jury to distinguish strictly between Glen and Stephen Miller when listening to the evidence, particularly where the evidence itself did not explicitly make the distinction. In its closing instructions the court warned the jury to consider the case carefully and separately against each co-defendant and that a verdict against one did not necessitate the same verdict against the other. A review of the record reveals that the prosecution was careful to maintain the distinction between the Millers and that the court gave proper limiting instructions that accompanied the admission of evidence that was to be considered as to only one of the co-defendants. While Miller cites various generic references to "Mr. Miller" elicited during Stephen Miller's cross-examination of Robert Jones, a review of Jones' testimony makes clear that Jones is referring to Stephen Miller. In fact, virtually all of the cited instances involve Jones speaking directly to Stephen Miller and formally addressing him as "Mr. Miller."

Miller fares no better with his claim that he was unfairly prejudiced by Stephen Miller's *pro se* representation. As a precaution, the district court instructed the jury that nothing said by the lawyers, with particular reference to Stephen Miller, constituted evidence. The court also appointed stand-by counsel and instructed Stephen Miller that stand-by counsel was available to help him during the trial. Finally, the court strictly policed Stephen Miller's examination of witnesses to prevent him from testifying instead of questioning. While the district court did not follow all of the safeguards recommended by some courts for joint trials involving a *pro se* defendant, see, e.g., *Oglesby*, 764 F.2d at 1276; *United States v. Veteto*, 701 F.2d 136, 138–39 (11th Cir.1983); *United States v. Sacco*, 563 F.2d 552, 556–57 (2d Cir.1977), the steps taken by the district court in this case adequately protected Glen Miller's right to a fair trial.

We also reject Miller's contention that he was prejudiced because his defense strategy was antagonistic to that employed by Stephen Miller. Miller primarily defended on two grounds: that his conduct did not violate the court order and that, even if he did violate the order, he did not do so intentionally and willfully. Stephen Miller's defense centered around his claim that he did not willfully and intentionally violate the order because he was not aware that it applied to him. We simply do not believe that any conflict between these defenses "is so prejudicial that the differences are irreconcilable, 'and that the jury [would] ... unjustifiably infer that ... [any] conflict alone demonstrates that both [defendants] are guilty.' " *Becker*, 585 F.2d at 707 (citation omitted).

> Finally,
> [w]here the motion for severance is based, as here, on the asserted need for a co-defendant's testimony, the moving defendant must establish (1) a bona fide need for the testimony of his co-defendant, (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege, (3) the substance of his co-defendant's testimony, and (4) the exculpatory nature and effect of such testimony.

*United States v. Parodi*, 703 F.2d 768, 779 (4th Cir.1983) (citation omitted). Glen Miller has failed to make this showing as he argues on appeal only that he "had every reason to believe that Stephen Miller would testify and that his testimony would have exculpated him." Appellant's Brief at 39–40.

## VI

■ Miller lastly contends that the district court erred by allowing the prosecu-

tion to introduce irrelevant and unfairly prejudicial evidence. Specifically, Miller challenges the testimony of Holder and Jones, which, Miller claims, involved events occurring prior to the entry of the court order. The district court admitted this evidence under Fed.R.Evid. 404(b) as probative on the issue of Miller's intent in conducting activities allegedly violative of the court order. Miller challenges both the relevancy of the evidence and the propriety of its admission in light of its unduly prejudicial nature.

Questions related to the relevance of evidence are within the discretion of the district court, and this includes the question of whether the probative value of certain evidence is outweighed by the risk of undue prejudice its admission presents. *United States v. Zandi*, 769 F.2d 229, 237 (4th Cir.1985).

Holder's testimony was admitted to show that at least prior to the injunctive order, Miller's intention in the conduct of his paramilitary activities was oriented to their offensive uses. The prosecution contended that this same intent guided Miller's continuation of these activities even after the entry of the order. Miller's intent is relevant because § 14–288.20(b)(1) contains a scienter element, specifically, the intent that the conduct prohibited by the statute is undertaken "for use in, or in furtherance of, a civil disobedience." In this regard, Miller had repeatedly maintained, and continued to do so in his defense, that the CKKKK's paramilitary activities were exclusively defensive in character. We think that this evidence was both highly relevant and appropriately limited in effect by the court's instructions. The district court did not abuse its discretion in admitting it.

Jones testified that prior to the entry of the court order, Glen Miller had instructed him to work with Stephen Miller on procuring weapons and providing training for the CKKKK. Jones recounted that Stephen Miller told him that these actions were in furtherance of a plan to engage in armed insurrection against the government. Jones also explained that he continued providing this assistance to the CKKKK and its successor, the WPP, until he was arrested in July 1985—some six months after the entry of the court order—and that the instructions to do so were never withdrawn.

It is obvious that this evidence goes to the heart of the prosecution's case—the question of whether Miller ever engaged in or ordered conduct in violation of § 14–288.20(b)(1) and § 14–10 after the entry of the order. Again, we do not believe that the district court abused its discretion in admitting this evidence.

AFFIRMED.